[No. F047571. Fifth Dist. Aug. 9, 2005.]

In re TAMIKA C., a Person Coming Under the Juvenile Court Law.
KERN COUNTY DEPARTMENT OF HUMAN SERVICES, Plaintiff and
Respondent, v.
TAMIKA C., Defendant and Appellant.

**COUNSEL**

Beth A. Melvin, under appointment by the Court of Appeal, for Defendant and Appellant.

B. C. Barmann, Sr., County Counsel, and Jennifer E. Zahry, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**VARTABEDIAN, Acting P. J.**—Tamika C. has been a dependent child of the juvenile court placed in long-term foster care almost her entire life. The Kern County Department of Human Services (department) filed a petition seeking to terminate dependency after Tamika reached the age of majority. The department's basis for termination was to relieve itself of the increased financial obligation that must be borne by the department when a dependent child reaches the age of 19. Tamika, through her counsel, objected to the termination of dependency because she wished to remain a dependent child of the court until she completed her high school education, scheduled for June of 2006. The trial court terminated dependency. Tamika appeals from this order, claiming the trial court erred in terminating her dependency.

We must determine if it would be in Tamika's best interests to remain a dependent until she graduates from high school, or if the department's stated desire to save money is sufficient to override Tamika's best interests. We reverse.

## FACTS AND PROCEEDINGS

Tamika's infant brother was abandoned by their mother. The department investigated and determined that Tamika and her three older sisters were being cared for by Tamika's paternal aunt (aunt). A Welfare and Institutions Code section 300 petition was filed, and Tamika entered the dependency system at the age of 18 months because of her father's incarceration and her mother's drug abuse.

The three older sisters and Tamika were allowed to remain under the care of the aunt and remained dependents of the court in long-term foster care. Tamika's mother disappeared and her father showed little interest in Tamika and her siblings. He was in and out of prison.

Tamika continued to live with the aunt in a placement described as of high quality and stability. Tamika began attending school and repeated second grade because of her low grades and immaturity. It was noted in third grade that Tamika had problems with comprehension; her grade point average was 1.66 on a 4.0 scale. Tamika continued in school and her caretaker noted no significant behavior problems.

After fifth grade, Tamika was required to attend the opportunity class in summer school. Tamika had been in a fight at school and would otherwise have not been allowed to finish out the school year had she not so enrolled.

Tamika's aunt's husband died and the aunt was under stress because of this and taking care of four teenage girls. Tamika's behavior improved in the sixth grade. Tamika did not present any major problems in the home.

In seventh grade, Tamika received detention for being disrespectful. Tamika continued to not present any problems in the home.

In July of 2001, when Tamika was 15 years old, she was placed with her paternal cousin and her husband. In the eighth grade Tamika was cocaptain of the cheerleading squad. Tamika continued in school and was a well-adjusted child. She was described as outgoing, talkative, social, and very likeable.

Tamika had a grade point average of 2.12 in ninth grade. She was very active in extracurricular activities. Tamika was comfortable in her home and did not cause any problems. Her caretaker was trying to have Tamika transferred to a more "elemental" science class because she was failing in the science class she was in.

Active in extracurricular activities in the 10th grade, Tamika attended some "RSP" classes.[1]

Tamika was referred to the independent living skills program (ILP) on September 11, 2002. As of February 12, 2004, she had not participated in any classes.

It was reported that Tamika enjoyed school and was looking forward to entering the 11th grade. Tamika said that she had good grades, although this was a self-report and the social worker did not verify Tamika's report of her grades. Tamika told the social worker that she wants to attend beauty school after she graduates from high school.

Tamika was enrolled in ILP. She attended a retreat but was expelled because she was out of her room at 2:00 a.m.

On February 9, 2005, Tamika and her social worker signed a form entitled "Termination of Dependency Jurisdiction—Child Attaining Age of Majority." The form was a checklist type of form following the criteria set forth in Welfare and Institutions Code section 391 and had boxes to check indicating documents provided to Tamika as well as assistance that had been provided to her.[2] Although the form stated that Tamika had initialed "above" for the

---

[1] RSP evidently stands for resource specialist program; see Education Code section 56362.

[2] All future code references are to the Welfare and Institutions Code unless otherwise noted.

information and services received, there were no initials on the form. In addition, the form stated that six pages were attached, yet these pages are not attached to the report in the record. There is a six-page report later in the record, and this appears to be the report purportedly referred to as the attachment to the termination of jurisdiction form signed by Tamika. We note that, although this appears to be the correct report, the report is dated and signed by the social worker on February 18, 2005, nine days after Tamika and the social worker signed the form. We further note that the form, signed by Tamika and the social worker, states "I declare under penalty of perjury . . . that the foregoing and all the attachments are true and correct."

The social worker filed a report dated February 10, 2005, for the next review hearing. The social worker stated that Tamika would turn 18 that month. Tamika was in the 11th grade. The social worker had discussed with Tamika and her academic counselor the possibility of Tamika's graduating after the fall semester of 2005, thus enabling her to graduate before her 19th birthday.[3] Tamika stated her desire to not "miss out" on her senior year. In addition, Tamika expressed an interest in going to beauty school. Her counselor stated that she would have to improve her grades in order to be accepted into the beauty school program.

The report contained a section regarding the ILP. It was reported that Tamika was enrolled in the ILP. She had a separate social worker for this program. Tamika stated she was not receiving her mail from ILP. Her social worker reported that the information had been sent, but she would resend it. Tamika stated she was interested in participating in ILP activities, but she did not have transportation.

The social worker noted that an emancipation hearing pursuant to section 391 was calendared for March 1, 2005.

The February 18, 2005 report (supposedly attached to the termination form of February 9, 2005) repeated the discussion with Tamika's counselor regarding Tamika's early graduation. Tamika's caretaker stated that Tamika could remain in her home as long as she wished. Tamika possessed her birth certificate and Social Security card. In addition, Tamika had been given a check so she could get her California identification card. The social worker had applied for Medi-Cal for Tamika. The social worker reported that Tamika would be provided with "Emancipation Independent Living." The report stated that "the child" has requested that jurisdiction be terminated.

A hearing was held on March 1, 2005. The court indicated it had read the report of February 18, 2005. Tamika was present at the hearing and, although

---

[3] The report does not state anything about the content of these discussions.

her usual counsel was not present, Tamika was represented by substitute counsel for the hearing. Counsel stated that Tamika was opposed to the dismissal of dependency and wanted to complete high school. Counsel stated he believed it would be in Tamika's best interest for the court to continue dependency in her case. Counsel emphasized that Tamika intended to participate in her schooling and she had a serious desire to complete high school. Counsel offered to have Tamika testify about her seriousness in wanting to complete her schooling.

The court asked to be educated and asked if Tamika is disqualified from continuing jurisdiction because she would graduate after her 19th birthday. Tamika's counsel stated that the court can maintain jurisdiction until the age of 21.

The court asked the department for its position on the matter. Counsel for the department stated: "The Department's recommendation is that the matter be dismissed at this time because she would graduate after her 19th birthday.

"If jurisdiction is continued for a child under extremely unusual circumstances until the child is 21 years of age then the Department bears the full financial responsibility of maintaining that child with federal and state assistance to 18, between 19 and 21, and it's highly unusual circumstances when that ever happens.

"Now, she has action here. That is why Ms. Gilliam and I met with the school counselor and the child, or the young lady, to find out whether or not she could graduate in the fall of 2005 this year which would be before her birthday and be maintained in the foster care system until that time. But it's her election to graduate with her class in 2006, June 2006."

Counsel representing Tamika at the hearing stated he did not know a lot about the plan to have Tamika graduate early because he was not her usual counsel. He offered to put Tamika on the stand and ask her questions about her graduation plans or the court could continue the matter until her counsel got back.

The court stated it did not want to put Tamika on the stand without a full awareness of the consequences to her. The court stated that someone should talk to Tamika about the consequences of continuing with the plan of graduating in 2006. The court continued the matter.

At the outset of the continued hearing, the court stated that the purpose of continuing the hearing was to give counsel and Tamika an opportunity to "further consider whether she wants to graduate from, on her, after her 19th

birthday." Tamika's usual counsel represented her at the hearing. She stated that Tamika was already in "RSV classes," which are classes for slow children. She said it would get Tamika nowhere to expect her to complete school in an abbreviated fashion. Counsel pointed out that Tamika is in school, she is participating, and she is doing very well. Counsel argued that Tamika should be able to finish out high school with the class she is familiar with. Counsel argued it would not be to Tamika's advantage to have her dependency jurisdiction terminated now. Counsel acknowledged that funding is a problem when a child becomes 19 years old, but the court needs to look at the best interests of the child in making its decision.

The court asked for additional comments. The attorney representing the county commented as follows: "I stated my position last time that to maintain jurisdiction beyond the child's 19th birthday there has to be extremely unusual circumstances that don't appear to be present here. [¶] And the total financial burden would fall to the Department of Human Services with no assistance from the federal government or the state."

The court terminated the dependency. It found that all requirements were met. In addition it stated, "the child is not to graduate before her 19th birthday" and "[t]he court finds no extenuating circumstances that would cause the Department to continue that jurisdiction at this time."

Tamika appeals.

## DISCUSSION

"The court may retain jurisdiction over any person who is found to be a dependent child of the juvenile court until the ward or dependent child attains the age of 21 years." (§ 303.) Tamika contends the trial court abused its discretion when it terminated her dependency after she reached the age of majority but before she graduated from high school.

■ We have numerous concerns about what occurred in this case; we begin with the burden of proof. "The burden of proof on the issue of termination rests with the party seeking to terminate jurisdiction . . . ." (*In re Robert L.* (1998) 68 Cal.App.4th 789, 794 [80 Cal.Rptr.2d 578]; see *In re Holly H.* (2002) 104 Cal.App.4th 1324, 1330 [128 Cal.Rptr.2d 907].) ■ "In determining whether to terminate jurisdiction over a child in long-term foster care, the issue to be addressed is the best interest of the child." (*In re Robert L., supra,* at p. 793; see *In re Holly H., supra,* at pp. 1332–1333.)

Contrary to the law, the department came up with its own burden of proof requiring extremely unusual circumstances to maintain jurisdiction and, rather than looking at the best interests of the child, utilized as its reason for termination protection of its sacred dollars. The trial court apparently adopted the department's newly invented burden of proof when it stated, "The court finds no extenuating circumstances that would cause the Department to continue that jurisdiction at this time."

The department and the court turned the burden of proof on its head, requiring "extenuating" or "unusual" reasons (presumably to be brought forth by Tamika) to maintain jurisdiction, rather than requiring the department to prove that termination of jurisdiction was in the best interests of the child. For this reason alone the judgment must be reversed.

■ In addition, the trial court found that "[a]ll requirements have been met." One of the requirements that must be met before dependency jurisdiction over a child who has reached the age of majority may be terminated is satisfying section 391. Section 391 was enacted in 2000 and is a checklist of things that the department must furnish (with some exceptions) to a minor who has reached the age of majority before dependency jurisdiction can be terminated. The purpose of section 391 was to reverse a disturbing trend of foster youth being emancipated before they are ready to live independently. The author of section 391 noted: " '[E]very year in California, thousands of youth in foster care reach the age of 18, and suddenly are left to their own devices. Most are not adequately equipped for more than basic survival. Often they lack a high school diploma, have no job skills, and many have no place to live. Yet they are expected to become productive members of society. The odds are against them and many become homeless, become involved in crime, or once again become the responsibility of the state.' " (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 686 (1999–2000 Reg. Sess.) Apr. 22, 1999 p. 3 <http://www.leginfo.ca.gov/pub/99-00/bill/asm/ab_0651-0700/ab_686_cfa_19990422_080203_asm_comm. html> [as of Aug. 9, 2005].)

■ Pursuant to section 391, subdivision (b), before dependency may be terminated the department is required to submit a report verifying that the information, documents, and services set forth in section 391 have been provided to the child. If the department has not met the requirements, dependency may not be terminated, except in circumstances not relevant to this discussion.

We begin by noting the problems we perceive from the form signed by Tamika and the social worker and the section 391 report signed by the social

worker. As set forth previously, on the form signed by Tamika, above her signature it states: "I certify that I have received the information and services that I initialed above." There are no initials on the form. In addition, the form stated that six pages were attached, yet these pages are not attached to the form in the clerk's transcript. There is a six-page report later in the record and this appears to be the report purportedly referred to as the attachment to the termination of jurisdiction form signed by Tamika. Although this appears to be the correct report, the report is dated and signed by the social worker on February 18, 2005, nine days after Tamika and the social worker signed the form. We further note that the form, signed by Tamika and the social worker, states "I declare under penalty of perjury . . . that the foregoing and all the attachments are true and correct." Because these defects were not raised in the trial court and are not raised as error on appeal, they do not amount to a cognizable issue; we merely note them as evidence of the manner in which this case was treated by the department.

■ One of the items that must be contained in the report is verification that the dependent has been provided "[a]ssistance in applying for admission to college or to a vocational training program or other educational institution and in obtaining financial aid, where appropriate." (§ 391, subd. (b)(4).)

The form provided to Tamika stated that assistance had been provided to her in several areas. One area that was checked off was "Application for college, vocational training program, or other educational or employment program has been completed." The report summarized the services provided to Tamika in this area. "Tamika will graduate from . . . High School in June 2006. On January 11, 2005, the undersigned discussed with Tamika and her academic counsel, Ross Shafer, the possibility of her graduating after the fall semester of 2005. This would enable her to remain in the foster care system because she would graduate before her 19th birthday. Tamika decided that she wanted to complete her senior year and graduate with her class in June 2006. She informed Mr. Shafer of her desire to attend Lyles College of Beauty. Mr. Shafer explained to her that she would have to improve her grades in order to be accepted into the program."

■ The department is required to provide assistance to the dependent in applying to schools to further his or her education. The department's assistance here amounted to forcing Tamika to attempt to finish high school in an abbreviated timeframe, knowing that she was a slow student, knowing she was taking RSP classes, and knowing that she needed to improve her grades

in order to be accepted into beauty school.[4] While section 391 does not require that the department assure the dependent obtains her high school diploma, the educational component portion of this section surely does not envision that the department will throw roadblocks in the dependent's educational goals. The actions of the department here are more in the nature of sabotage rather than assistance.

Respondent argues that the educational assistance portion of section 391 contained in subdivision (b)(4) does not apply because Tamika was not yet applying for beauty school. If it does not apply, then we question why the social worker declared under penalty of perjury that "[t]he following assistance has been provided to the child: . . . [a]pplication for college, vocational training program, or other educational or employment program has been completed."

We further find that the department's actions regarding whether Tamika could retain her status as a dependent of the juvenile court resembled *Let's Make a Deal* (except there were no good prizes behind any of the doors) rather than looking out for the best interests of the dependent. The department stated that if Tamika went along with the accelerated "plan" to graduate before her 19th birthday (in February of 2006) she would be retained in foster care until her early graduation (presumably in December of 2005). If she chose to continue her education in the normal fashion, the department was seeking immediate termination (while Tamika was 18 but still a junior in high school). This bargain was stated by counsel for the department at the first hearing regarding termination. "Now, she has an action here. That is why Ms. Gilliam and I met with the school counselor and the child, or the young lady, to find out whether or not she could graduate in the fall of 2005 this year which would be before her birthday and be maintained in the foster care system until that time. But it's her election to graduate with her class in 2006, June 2006." The court went along with the department's plan and indicated that Tamika's counsel needed to explain to her "the consequences of perhaps continuing with the plan [of] an '06 graduation." The court continued the matter so this discussion could take place.

The court began the next hearing by stating it had continued the hearing to "give counsel and child an opportunity to further consider whether she wants to graduate from, on her, after her 19th birthday." Tamika's counsel made her plea for the continuation of services:

---

[4] Normally when a student is in the RSP and is taking RSP classes, he or she has an individualized education program (IEP). There is nothing in the record indicating that Tamika has an IEP, but if she is subject to an IEP then the department could not unilaterally alter her educational plan and coerce her into an early graduation without meeting specific requirements. (See Ed. Code, § 56032; 20 U.S.C. § 1400 et seq.)

"MS. FURLONG [counsel for Tamika]: Your Honor, Tamika is in RSV classes which are classes for slow children.

"THE COURT: Okay.

"MS. FURLONG: So, to expect her to do in six months which is going to basically take a year to do is going to get her nowhere. And we are in a situation where she is going to school. She is participating. She is doing very well. She, as the Court knows from the way the Code reads, the Code tries to give the child a normal life as possible.

"When they are in foster care, she would be able to graduate with the class that she is familiar with, finish out high school, and she is just not in a situation where she would—it would be to her advantage to have this terminated now. And I'd ask the Court to continue—I understand that funding becomes a big problem with the Department once a child is over 19.

"But that is a funding issue and I think the Court really needs to look at the best interests of the child."

The department reiterated the financial burdens of continuing one in dependency after he or she reaches the age of 19.

Again, rather than requiring the county to prove that termination of dependency was in the best interests of Tamika, the burden was placed on Tamika to choose between continued dependency under the unrealistic plan of the county or to face termination of dependency so she could finish high school in the normal course. Having chosen the latter, more realistic, course her dependency was immediately terminated. We find it incongruous that on the one hand the department would recommend that Tamika be continued in dependency (if she agreed to their accelerated plan), yet on the other hand recommend that dependency be terminated immediately, merely days after she turned 18 and was in her junior year of high school, if she didn't agree to the department's plan. If Tamika met the criteria to remain as a dependent to finish high school under the accelerated program, why would she not also meet the requirements for continued dependency so she could finish her senior year in high school, much less complete her junior year in high school? Other than financial considerations espoused by the department, there is nothing in the record to explain the inconsistencies between the two positions. Again, rather than focusing on whether termination of dependency would be in Tamika's best interest, the entire focus was on whether termination of dependency would be in the best fiscal interest of the county.[5]

---

[5] The author of section 391 recognized the financial aspect of terminating the jurisdiction over a dependent when he or she reaches the age of majority. "Although the juvenile court has

■ All of the above leads us to our final discussion: whether the trial court abused its discretion when it terminated Tamika's dependency. We begin by noting that even if the trial court correctly found that all of the requirements of section 391 were met, section 391, subdivision (c) expressly states that this is not a limitation on the discretion of the juvenile court to continue jurisdiction for other reasons. We examine the two cases relied on by the parties that discuss whether the trial court abused its discretion in its decision regarding whether to terminate the jurisdiction over a dependent who had reached the age of majority.

*In re Robert L., supra,* 68 Cal.App.4th 789 was decided before the enactment of section 391. Although it was determined before section 391 was enacted, it is pertinent on the question of whether the trial court abused its discretion here. Robert, born in 1977, and his sister Michelle, born in 1979, were placed with their maternal grandparents in long-term foster care. Robert and Michelle both excelled in school and each obtained part-time jobs during high school. Robert began attending state college in 1996. He continued to live with his grandparents and worked before and during college. In July of 1997 he had completed two years of college with a B+ average. His sister Michelle was active in activities during high school and worked during high school. She planned to attend state college and to continue to live with her grandparents. (*Robert L., supra,* at pp. 791–792.)

In July of 1997, just prior to Robert's 20th birthday, the department recommended termination of jurisdiction over Robert because he was almost 20 years old, had graduated from high school, had successfully completed two years at a university, lived in a stable home, and was a high-functioning young adult. Robert opposed termination of jurisdiction because his grandparents needed the income to help defray educational and living expenses. The court retained jurisdiction. (*In re Robert L., supra,* 68 Cal.App.4th at p. 792.)

At the next hearing in January of 1998, the department recommended that jurisdiction over Robert and Michelle be terminated. The social worker stated that both dependents had graduated from high school, were doing well academically in college, and were residing in a stable home. The dependents opposed termination of juvenile court jurisdiction because of the financial burden it would place on their grandparents. The court did not terminate

---

the authority to retain jurisdiction over a dependent child until the age of 21, the reality is that federal funding for foster youth ends at the age of 18, and common practice is for the juvenile court to terminate jurisdiction at that time." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 686, *supra,* p. 3 <http://www.leginfo.ca.gov/pub/99-00/bill/asm/ab_0651-0700/ab_686_cfa_19990422_080203_asm_comm.html> [as of Aug. 9, 2005].) Common practice does not equate to the correct practice, nor does it necessarily involve a consideration of the best interests of the dependent.

jurisdiction but scheduled a hearing for March of 1998. (*In re Robert L., supra,* 68 Cal.App.4th at p. 792.)

The department requested termination at the March 1998 hearing. Robert stated at the hearing that if his grandparents did not receive assistance, he would not be able to graduate from college. He argued that his graduation from college would benefit society because he would have increased earnings and be paying higher taxes. The court denied the department's request and retained jurisdiction. (*In re Robert L., supra,* 68 Cal.App.4th at pp. 792–793.)

The department appealed, claiming the trial court abused its discretion in retaining jurisdiction. The appellate court agreed. It found that the "sole basis for extension of jurisdiction was to afford *special assistance* to Michelle and Robert to allow them to complete their college education. We are aware of no legislative mandate that the dependency system is to be utilized to subsidize higher education. . . . Absent any evidence of current or future threatened harm to Michelle and Robert, the juvenile court abused its discretion in extending jurisdiction over Michelle and Robert." (*In re Robert L., supra,* 68 Cal.App.4th at p. 797.)

The more recent case of *In re Holly H., supra,* 104 Cal.App.4th 1324 was decided after section 391 was enacted. Although the case occurred after the passage of section 391, the appellate court held that "[s]ection 391 does not change the standard set forth in *Robert L.,* that the 'exercise of jurisdiction must be based upon existing and reasonably foreseeable future harm to the welfare of the child.' [Citation.] Section 391 contains a legislative directive that before jurisdiction of the juvenile court over a dependent child who has reached age 18 is terminated, certain minimal assistance and documentation be afforded the youth. However, whether or not those services have been provided, the decision to retain or terminate jurisdiction remains within the sound discretion of the juvenile court." (*Holly H., supra,* at p. 1333.) The court also found that "[i]n light of the indeterminancy of this standard and the autonomy to which a person over 18 is entitled, once a young person has reached majority the juvenile court must give substantial deference to the youth's wishes before deciding to retain jurisdiction." (*Id.* at p. 1327.)

Holly was not present at the termination hearing. The department presented evidence of its efforts to assist Holly in multiple areas, including medication and therapy for her psychiatric issues, doctors' appointments for a medical condition, job training, and help with an application for SSI benefits. Holly did not take advantage of these services. Her counsel argued that dependency should not be terminated because Holly was at a continuing risk of harm. In response to counsel's argument, the court stated, " 'she fails to meet the

department halfway. I just don't see the department can do any more . . . .' "
The trial court terminated dependency. (*In re Holly H., supra,* 104 Cal.App.4th
at p. 1329.)

The appellate court found the trial court did not abuse its discretion when it
dismissed dependency.

"Despite her attorney's arguments to the contrary, Holly has given every
indication that she does not want the assistance of the juvenile dependency
system. Through her attorney, Holly argues that the court abused its discre-
tion by dismissing the petition since there was evidence that she 'still needs
the supervision, care and protection of the juvenile court.' She points out that
she has been separated from her siblings for years, and has moved from
placement to placement with no hope for stability since her grandmother
became too ill to care for her when she was 13. While she graduated from
high school, it is undisputed that she has a serious learning disability. She has
consistently failed to demonstrate that she is able to hold a job or even to
complete job training. She has shown no ability to manage her finances, using
the small amount of Social Security benefits that she was awarded as a result
of her father's untimely death to move out of her group home. Her school
counselor noted that she had 'no savings, no plan for where to live or how to
provide for herself [and] I am afraid that she will end up on the streets when
she graduates . . . .'

"Although one may reasonably conclude that these facts demonstrate a
continued need for assistance, Holly has repeatedly refused to take advantage
of services that have been offered to her. She failed to appear for an
evaluation that might have allowed her to receive income from SSI; she
failed to report for a job that the department helped to secure for her; and as
just noted she left her group home when she began receiving a very small,
limited-term income as the result of her father's death. Holly's continued
participation in the juvenile dependency system cannot reasonably be ex-
pected to prevent any future harm when she has effectively rejected nearly all
offers of assistance from the department. Moreover, Holly has not been
charged with committing a crime, and there is no suggestion that she is
subject to commitment under section 5150. Now that she has reached the age
of majority and has acquired the rights and responsibilities that come with
adulthood, the court may not, and should not, force her to accept its services.
The trial court properly considered Holly's unwillingness to utilize the
services that had been offered to her in deciding to terminate its jurisdiction."
(*In re Holly H., supra,* 104 Cal.App.4th at p. 1337, fns. omitted.)

We find Tamika's case easily distinguishable from *Robert L.* and *Holly H.*
Tamika is not seeking special assistance to attend college. Robert and

Michelle had both graduated from high school and completed some of their college before the court terminated their jurisdiction. In addition, neither Robert nor Michelle struggled in high school, and both took advanced placement courses. Tamika is still in high school. She is a slow learner and attends RSP classes. She attends class regularly, is involved in activities, and through no derelictions on her part will not complete high school until after she is 19 years old. We refuse to hold her responsible for being retained in the second grade.

Tamika is not remotely similar to Holly H. Unlike Holly H., Tamika is willing to, and has, utilized the services that have been offered to her. In addition, Tamika wanted to take advantage of services available to her yet was unable to participate in some activities through no fault of her own. For example, Tamika stated she would like to participate in ILP activities, but she did not have a ride. It does not appear that the department did anything to assist her in obtaining a ride so she could participate. Unlike Holly H., Tamika does not have her high school diploma. Unlike Holly H., Tamika is making every effort to better herself and to graduate from high school in a timely manner.

In the juvenile court and on appeal, the department relies on the fact that Tamika's caretakers stated that she could remain with them for as long as she wants. This is certainly a generous offer by her caretakers, but they are not bound by their statements and if they change their minds or something unforeseen should happen to change their circumstances, Tamika could easily end up without a home while she is still in high school.

The trial court abused its discretion when it terminated dependency over Tamika. It was in the best interests of Tamika for the juvenile court to retain jurisdiction over her. There was an existing and reasonably foreseeable threat of harm to Tamika if she was not allowed to remain a dependent of the court while she finished her high school education under a normal schedule.

■ In sum, the trial court erred in applying the wrong burden of proof to the question of whether dependency should be terminated at the request of the department. Neither the department nor the court gave consideration to the best interests of the child. The social worker's report was inadequate and flawed, and all of the requirements of section 391 were not met. The department's all-or-nothing plan, accepted by the court, was incongruous and unacceptable. The department and the court erroneously misplaced the emphasis in the proceedings from Tamika's best interests to financial considerations. The trial court abused its discretion when it terminated dependency over Tamika.

## DISPOSITION

The order of March 8, 2005, terminating Tamika's dependency is reversed, and dependency is ordered reinstated back to that date and continuing forward.

Wiseman, J., and Levy, J., concurred.