Filed 5/30/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re NADIA G., a Person Coming Under the Juvenile Court Law. | B243392 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>MARIA R.,<br><br>        Defendant;<br><br>NADIA G.,<br><br>        Appellant. | (Los Angeles County Super. Ct. No. CK82104) |

        APPEAL from an order of the Superior Court of Los Angeles County, Elizabeth Kim, Juvenile Court Referee.  Reversed and remanded with directions.

        Patti L. Dikes, under appointment by the Court of Appeal, for Appellant.

        No appearance for Plaintiff and Respondent.

————————————

INTRODUCTION

Welfare and Institutions Code section 391[1] authorizes the juvenile court to terminate its jurisdiction over a nonminor dependent in foster care who is between the ages of 18 and 21, but only in three narrowly defined circumstances and only after the county welfare department has submitted a report containing recommendations and verifying it has provided the nonminor with certain information, documents, and services. (§ 391, subds. (b)-(e).)  The juvenile court terminated its jurisdiction over Nadia G. (*id.*, subd. (c)(1)(B)) and she appeals.  We hold that the record supports the court's findings that Nadia was not participating in a transitional independent living case plan (*ibid.*), one of the grounds for terminating jurisdiction.  (§§ 366.32, subd. (a), 303, subd. (a), 391, subd. (c).)  However, although ordered by the court to comply with the requirements of section 391, the Department of Children and Family Services (the Department) failed to file a section 391 report, with the result jurisdiction may not be terminated yet.  (§ 391, subds. (b) & (e).)  Accordingly, as it was premature, we reverse the order terminating jurisdiction.

FACTUAL AND PROCEDURAL BACKGROUND

1. *The dependency*

The juvenile court declared Nadia a dependent in 2010 when she was 17 years old because her mother was unwilling and unable to provide parental care and supervision and her father had long ago left the family.  (§ 300, subds. (b) & (g).)  Nadia qualifies for special education, but has a history of truancy beginning when she was 14 years old.  Hence, she has no high school credits.  She started drinking alcohol at age 12.  She was defiant and belligerent.  Nadia had an infant and was pregnant with her second child when she was removed from her mother's care.  She gave custody of her first born to her mother.

---

[1]     All further statutory references are to the Welfare and Institutions Code, unless otherwise noted.

The juvenile court ordered the Department, among other things, to enroll Nadia in counseling; to refer her to trauma-focused cognitive behavior therapy, a parenting program, and a substance abuse program, and to report on the status of her schooling.

2. *Nadia's dependency has been marked by instability and inconsistency interspersed with short periods of cooperation.*

Throughout this dependency, Nadia would comply with the juvenile court's requirements, the Department's programs, and house rules for a time and then run away from her foster placement and return to her old behaviors. In her first placement, Nadia was rebellious and disrespectful and she refused to attend school. Her first foster parent wanted Nadia removed because of her misbehavior. Instead, Nadia ran away in September 2010, just months after the juvenile court assumed jurisdiction.

Although placement proved difficult because Nadia was pregnant, the Department next found her a bed at a home for girls. Nadia had difficulty adjusting to the group home's rules, and within the first month she had run away twice and was involved in a physical altercation with another resident. Eventually, Nadia settled into the group home and began attending school and participating in many of her programs. Nadia's second child was born in November 2010.

Only two months later, however, Nadia returned from an overnight visit with her mother a day late and intoxicated and had to be prompted several times to wake up to tend to her infant. When she failed to pick up her infant from a visit with the child's father, the Department detained the baby. After the baby's detention, Nadia began skipping school and staying in bed until late morning. She would go out in the evenings and on weekends, returning only to sleep or spend the day. She was arrested five months after the baby was born for assaulting and threatening staff at the group home. Upon her release from jail in early April 2011, she told her social worker she did not want the Department to find her another placement. Instead, she opted to stay with an unnamed friend and so the Department did not know her whereabouts for over a month.

Nadia finally contacted the Department from the Los Angeles Police Department's 77th Precinct in May 2011 to announce she had been arrested for battery. By then, she

was 18 years old and did not wish to return to her mother's home, preferring to reunify with her baby. Nadia's mother did not want to continue with reunification.

3. *The Department recommends terminating dependency jurisdiction.*

In May 2011, the Department notified the juvenile court that Nadia had once again gone missing. The Department requested a progress review hearing be scheduled in August 2011 to assess Nadia's compliance with the court-ordered child welfare services, and *the Department recommended*, if she was not complying, that the *juvenile court terminate jurisdiction*.

In August 2011, the Department reported that Nadia was living with a "non extended family member," although the placement was at risk because the foster mother's son had a criminal record. Apart from housing, Nadia was trying to make positive changes. She appeared to be "very motivated," and as before, "appear[ed] to be serious about re-directing her life." She started attending school where she was "very motivated" to get her General Education Diploma (GED). In the social worker's view, Nadia was doing her best to follow her program and to keep up with her appointments and responsibilities so that she could reunify with her baby.

Nadia's motivation was apparently short lived as a month later, in September 2011, she ran away and her whereabouts were unknown for four months. The record contains no further indication of Nadia's participation in her court-ordered child welfare services.

During this four-month interval, in November 2011, the social worker reached Nadia by telephone. She was staying with a friend but refused to reveal her whereabouts. She admitted she was drinking and declared she had lost all motivation when she lost custody of her baby. She had worked for a few days and was looking for somewhere to live. The social worker warned Nadia that her case could not remain open if she was not compliant with school and other court-ordered services. Nadia understood.

Nadia's whereabouts were still unknown when the Department filed its next status review report *recommending termination of juvenile court jurisdiction*.

4. *The juvenile court announces its intention to terminate jurisdiction and orders the Department to prepare Nadia for emancipation.*

Nadia did not appear at the scheduled hearing in December 2011. Her attorney relayed Nadia's wish that jurisdiction continue. Nadia wanted services and wanted to be placed in suitable housing. Finding emancipation to be the appropriate goal for Nadia, the juvenile court ordered the Department to file the most current transitional independent living case plan (TILP) if it continued to recommend terminating jurisdiction. The court announced its intention to terminate jurisdiction if Nadia showed little cooperation in her services and did not keep the Department informed of her whereabouts and *ordered the Department "to conform with [the] requirements in WIC [section] 391."* (Italics added.)

At the end of December 2011 Nadia asked her social worker to come get her. Then, she changed her mind and asked to be given housing after the new year. The Department made several attempts to find suitable housing for Nadia and finally placed her in a group home in January 2012. Nadia participated in creating her TILP in early January 2012.

That same month, the juvenile court ordered the Department to "assess Nadia ASAP for AB12 [section 391] eligibility and programs . . . ."

In February 2012, before her transition meeting was held, Nadia was removed from her group home, as it was only a 30-day shelter. Preferring to stay with a friend instead of a shelter, Nadia vanished for two months. She finally contacted her social worker in April 2012 to report that she and her boyfriend were renting a room but she again refused to provide an address and had no working cell phone. *She stated she would agree to close her case.* Nadia did not appear at her re-scheduled transition conference at the end of April 2012 and did not contact her social worker.

Nadia finally appeared for a transition conference in May 2012. By this time, she was three months pregnant. She and her boyfriend were living at his parents' house where they planned to remain until they could afford a place of their own. Informed of the services and requirements under section 391, Nadia stated she would like to continue with services until she turned 21. Recognizing what she would have to do to maintain

5

dependency jurisdiction, Nadia stated she was stable and was committed to re-enrolling in school and to remaining in her current home. She agreed to undergo mental health treatment and to keep in regular contact with her social worker. Under the heading "recommendation" in the status review report, *the Department requested the court order Nadia to remain a dependent of the court*.

In June 2012, the juvenile court asked the Department why it wanted to keep the case open as Nadia had not been in school in months, was not working, and was not living in approved housing. The Department replied it was simply trying to set Nadia on the right path in advance of closing her case. Nadia was trying to address her problems but claimed her individualized education plan made it difficult to enroll in school.

At the June 20, 2012 contested hearing, the court summarized Nadia's case: she was 19 years old; she held her own educational rights; the Department had not approved her residence as a Supervised Independent Living Placement;[2] and Nadia had only enrolled in school the week before the hearing. The court observed that the Department was working harder than Nadia to provide services and maintain jurisdiction over her. Counsel for the Department replied that for the past two months Nadia had been communicating with her social worker and so the Department recommended keeping the case open.

The juvenile court terminated its jurisdiction. It explained that Nadia had not participated in the services that the Department provided. Indeed, she refused services. Although Nadia represented she was willing to participate in some services, the court noted Nadia's difficulty following through with her promises. Nadia appealed and the Department did not file a brief.

---

[2] " 'Supervised independent living placement' means, on and after January 1, 2012, an independent supervised setting, as specified in a nonminor dependent's transitional independent living case plan, in which the youth is living independently, pursuant to Section 472(c)(2) of the Social Security Act (42 U.S.C. Sec. 672(c)(2))." (§ 11400, subd. (w).)

6

DISCUSSION

1. *Section 391*

The Legislature enacted section 391 in 2000 "in response to concerns that dependent children who had reached the age of 18 were being removed from the dependency system before they had adequate skills or resources to support themselves, and evidence that 45 percent of these young persons became homeless within a year after leaving the foster care system. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 686 (1999-2000 Reg. Sess.) as amended Aug. 29, 2000.) The Youth Law Center, which sponsored the legislation, posited that '[h]omelessness is not merely a housing issue, but is related to poor education, lack of a support system, estrangement from family, lack of marketable skills, poor employment prospects and lack of community linkages. Emancipation of foster youth before they are ready to live independently creates significant costs-both to the youth and to the state.' (*Ibid.*)" (*In re Holly H*. (2002) 104 Cal.App.4th 1324, 1330-1331.) In 2009, the Legislature rewrote section 391 to conform to federal law so as to maximize federal financial participation and extend transitional foster care services for youth between the ages of 18 and 21. (Off. of Sen. Floor Analyses, analysis of Assem. Bill No. 12 (2009-2010 Reg. Sess.) as amended Aug. 30, 2010, p. 1.)

For nonminor dependents who have permanent plans of long-term foster care, "the court *may* continue jurisdiction of the nonminor as a nonminor dependent of the juvenile court or *may* dismiss dependency jurisdiction pursuant to Section 391." (§§ 366.32, subd. (a), italics added, 303; *In re Tamika C*. (2005) 131 Cal.App.4th 1153, 1160; see also Off. of Sen. Floor Analyses, analysis of Assem. Bill No. 12 (2009-2010 Reg. Sess.), *supra*, at p. 8 [juvenile court is authorized to terminate jurisdiction over nonminors between ages 18 and 21].)

Section 391 expresses the legislative preference for retaining jurisdiction and so the statute authorizes the termination of jurisdiction in only three specific circumstances: the court finds (1) "[t]hat the nonminor does not wish to remain subject to dependency jurisdiction;" (2) "[t]hat *the nonminor is not participating in a reasonable and*

7

*appropriate transitional independent living case plan*;" or (3) "[t]he court finds after reasonable and documented efforts [that] the nonminor cannot be located." (§ 391, subds. (c)(1)(A), (c)(1)(B) & (d)(1); Cal. Rules of Court, rule 5.555(d)(2)(A)(i)-(iii), italics added.)

Even if the juvenile court terminates its dependency jurisdiction however, it "retain[s] general jurisdiction over the youth pursuant to Section 303. If the court has dismissed dependency jurisdiction, the nonminor, who has not attained 21 years of age, may subsequently file a petition pursuant to subdivision (e) of Section 388 to have dependency jurisdiction resumed and the court may vacate its previous order dismissing dependency jurisdiction over the nonminor dependent." (§ 366.32, subd. (c).)

Jurisdiction is maintained if there is " 'existing and reasonably foreseeable future harm to the welfare of the child.' [Citation.]" (*In re Holly H., supra*, 104 Cal.App.4th at p. 1333.) The principal question to be addressed when deciding whether to terminate jurisdiction over a child in long-term foster care is the best interest of the child. (*In re Tamika C., supra*, 131 Cal.App.4th at p. 1160.) "[T]he decision to retain or terminate jurisdiction remains within the sound discretion of the juvenile court." (*In re Holly H., supra*, at p. 1333.)

2. *The evidence supports the juvenile court's finding that Nadia was not participating in a reasonable and appropriate TILP (§ 391, subd. (c)(1)(B)) but termination of jurisdiction was premature because the mandates of section 391 were not followed.*

a. *Nadia was not participating in her TILP.*

Nadia contends there is insufficient evidence to support the juvenile court's finding she was not participating in her TILP, the second of the three bases for terminating jurisdiction. She reasons that the court found that she was not complying

8

with services, whereas subdivision (c)(1)(B) of section 391 requires the court to find that she was not participating in a reasonable and appropriate *TILP*.[3]

Section 391, subdivision (c)(1)(B) authorizes the juvenile court to terminate dependency jurisdiction if it finds "[t]hat the nonminor is not participating in a reasonable and appropriate [TILP]." The TILP describes the "collaborative efforts between the nonminor and the social worker . . . and the supportive services" provided to ensure meaningful transition to independent living. (§ 11400, subd. (y).) The TILP is the roadmap for the nonminor's transition to self-sufficiency.

The record here demonstrates that Nadia was *not participating in her TILP*. Entered into on January 9, 2012, Nadia's TILP required her, among other things, to (1) keep pushing to attend school on a daily basis with the goal of finishing high school; (2) try to be trustworthy and choose the right friends; (3) follow the programs necessary to obtain her green card; and (4) look for a job. The juvenile court stated it did not believe Nadia's claim that she had been trying to register in school or to participate in a program geared to obtaining her GED. The court observed that Nadia had suddenly enrolled in school just a week before the termination hearing and the court openly disbelieved Nadia's explanation for the delay. The court was entitled to question Nadia's veracity in light of her pattern of truancy, lying to her social workers, and running away. For the same reason, the court was understandably skeptical of Nadia's pledge, on the eve of the termination hearing, to comply with her TILP so as to remain a dependent. The

---

[3] " 'Transitional independent living case plan' means, on or after January 1, 2012, the nonminor dependent's case plan, updated every six months, that describes the goals and objectives of how the nonminor will make progress in the transition to living independently and assume incremental responsibility for adult decisionmaking, the collaborative efforts between the nonminor and the social worker, probation officer, or Indian tribal placing entity and the supportive services as described in the transitional independent living plan (TILP) to ensure active and meaningful participation in one or more of the eligibility criteria described in paragraphs (1) to (5), inclusive, of subdivision (b) of Section 11403, the nonminor's appropriate supervised placement setting, and the nonminor's permanent plan for transition to living independently, which includes maintaining or obtaining permanent connections to caring and committed adults, as set forth in paragraph (16) of subdivision (f) of Section 16501.1." (§ 11400, subd. (y).)

court's credibility determinations are not subject to reweighing on appeal. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52.) As for the remainder of Nadia's TILP, the Department was not in a position to determine whether Nadia was choosing the right friends as she made it a practice of hiding her whereabouts from the social workers, which thwarted their efforts to assess her choices. The Department, not Nadia, was attempting to obtain a green card for her, and although she claimed to be working, the information about that is almost nonexistent. Indeed, even Nadia agreed her case should be closed just two months before jurisdiction was terminated. The maintenance of jurisdiction for Nadia cannot realistically be expected to prevent any future harm to her where she has repeatedly rejected nearly all efforts of assistance from the Department and where the Department is working harder than she to maintain dependency jurisdiction.

In this respect, this case is not unlike the facts of *In re Holly H.*, *supra*, 104 Cal.App.4th 1324. There, the appellate court noted "[a]lthough one may reasonably conclude that these facts demonstrate a continued need for assistance, Holly has repeatedly refused to take advantage of services that have been offered to her. She failed to appear for an evaluation that might have allowed her to receive income from SSI; she failed to report for a job that the department helped to secure for her; and as just noted she left her group home when she began receiving a very small, limited-term income as the result of her father's death. Holly's continued participation in the juvenile dependency system cannot reasonably be expected to prevent any future harm when she has effectively rejected nearly all offers of assistance from the department." (*Id.* at p. 1337, fns. omitted.)

The record here also supports the court's finding that Nadia refused to take advantage of child welfare services the Department offered, which services were designed to aid Nadia in meeting the promises she made in her TILP. Nadia flouted the Department's plans for her and the extraordinary efforts the social workers have made to meet her needs and assure that she was cared for. Nowhere does the record indicate she is in therapy or a substance abuse program and she has prevented the Department from assessing her residence. After December 2011, when the juvenile court announced its

10

intention to emancipate Nadia, she disappeared; avoided the Department's efforts to communicate with her; refused to apprise her social workers of her whereabouts; declined the Department's attempts to locate housing for her; and skipped out of scheduled transition meetings. This recalcitrant truant's refusal to avail herself of the services the Department provided in an attempt to aid her transition to emancipation simply bolsters the court's conclusion she was not participating in her TILP and undermines any argument that continued jurisdiction could prevent future harm to her. (See *In re Holly H., supra*, 104 Cal.App.4th at pp. 1333, 1337.) This record supports the juvenile court's finding Nadia was not participating in a reasonable and appropriate TILP. (§ 391, subd. (c)(1)(B).)

b. *The termination order was premature because the Department never obeyed the juvenile court's order to comply with the mandates of section 391.*

Notwithstanding our conclusion above, termination of dependency jurisdiction was premature. The principal question for the juvenile court under section 391 is the best interest of the child. (*In re Tamika C.*, *supra*, 131 Cal.App.4th at p. 1160.) Toward that end, at any hearing at which the juvenile court is considering terminating its jurisdiction, the Department "*shall*" "[s]ubmit a report describing whether it is in the nonminor's best interests to remain under the court's dependency jurisdiction, which includes a recommended transitional independent living case plan" and "the facts supporting the conclusion reached." (§ 391, subd. (b)(2), italics added; Cal. Rules of Court, rule 5.555(c)(1)(A).)

The Department must also file a report verifying it has provided the youth with a checklist of information, documents, and services designed to aid the nonminor in transitioning to emancipation. (§ 391, subd. (e); Cal. Rules of Court, rule 5.555(c); *In re Holly H.*, *supra*, 104 Cal.App.4th at p. 1333.) Subdivision (e) requires the Department to provide the nonminor among other things, with (1) written information about the nonminor's dependency, family history, how to get access to his or her file, notification that the nonminor is granted preference for student assistant or internship positions with state agencies; (2) numerous documents, including a social security card, birth certificate,

11

health and education summary, state identification card, letters in compliance with state and federal financial aid documentation requirements, proof of citizenship or legal residence, advance healthcare directive form; and (3) assistance in obtaining employment or other financial support, referrals to housing, assistance in applying to school, and the like.[4] (See also Cal. Rules of Court, rule 5.555(c).)

---

[4] Subdivision (e) of section 391 includes in its list of information, documents, and services to be provided to the youth, among other things, "(1) Written information concerning the nonminor's dependency case . . . his or her family history and placement history, any photographs of the nonminor or his or her family . . . directions on how to access the documents the nonminor is entitled to inspect under Section 827, and the date on which the jurisdiction of the juvenile court would be terminated. [¶] (2) The following documents; [¶] (A) Social security card. [¶] (B) Certified copy of his or her birth certificate. [¶] (C) Health and education summary . . . . [¶] (D) Driver's license . . . or identification card . . . . [¶] (E) A letter prepared by the county welfare department [including among other things a statement that the nonminor was a foster youth in compliance with state and federal financial aid documentation requirements]. [¶] . . . [¶] (F) If applicable, the death certificate of the parent or parents. [¶] (G) If applicable, proof of the nonminor's citizenship or legal residence. [¶] (H) An advance healthcare directive form. [¶] (I) The Judicial Council form that the nonminor would use to file a petition pursuant to subdivision (e) of Section 388 to resume dependency jurisdiction. [¶] (J) The written 90-day transition plan prepared pursuant to Section 16501.1. [¶] (3) Assistance in completing an application for Medi-Cal or assistance in obtaining other health insurance. [¶] (4) Referrals to transitional housing if available, or assistance in securing other housing. (5) Assistance in obtaining employment or other financial support. [¶] (6) Assistance in applying for admission to college or to a vocational training program or other educational institution and in obtaining financial aid, where appropriate. [¶] (7) Assistance in maintaining relationships with individuals who are important to a nonminor who has been in out-of-home placement for six months or longer from the date the nonminor entered foster care, based on the nonminor's best interests. [¶] (8) For nonminors between 18 and 21 years of age, assistance in accessing the Independent Living Aftercare Program in the nonminor's county of residence, and, upon the nonminor's request, assistance in completing a voluntary reentry agreement for care and placement pursuant to subdivision (z) of Section 11400 and in filing a petition pursuant to subdivision (e) of Section 388 to resume dependency jurisdiction. [¶] (9) Written information notifying the child that current or former dependent children who are or have been in foster care are granted a preference for student assistant or internship positions with state agencies pursuant to Section 18220 of the Government Code."

12

If the Department has not met the section 391 requirements, the juvenile court is forbidden to terminate its jurisdiction. Subdivision (e) of section 391 states: "The court *shall not terminate* dependency jurisdiction over a nonminor dependent . . . until . . . the [D]epartment has submitted a report *verifying* that the following information, documents, and services *have been provided to the nonminor*, or in the case of a nonminor who, after reasonable efforts by the county welfare department, cannot be located, verifying the efforts made to make the following available to the nonminor." (Italics added; Cal. Rules of Court, rule 5.555(d)(2)(E)(i); see *In re Tamika C*., *supra*, 131 Cal.App.4th at p. 1161.)[5]

Based on the section 391 report prepared by the county welfare department and on the entire file, the juvenile court must, if it decides to terminate jurisdiction, make a series of findings on the record. Principally, the court is directed to determine "[w]hether remaining under juvenile court jurisdiction is in the nonminor's bests interests" and state on the record the "facts in support of the finding made." (Cal. Rules of Court, rule 5.555(d)(1)(B); *In re Tamika C*., *supra*, 131 Cal.App.4th at p. 1160.) Additionally, the court must find that the nonminor had the opportunity to confer with counsel; whether the nonminor understands the potential benefits of remaining in foster care under juvenile court jurisdiction; and the right to reenter foster care. (§ 391, subd. (c)(1)(B)(2); Cal. Rules of Court, rule 5.555(d) & (d)(1).)

Here, despite the juvenile court's announcement, six months before the termination hearing, that it planned to emancipate Nadia, and the court's clear and repeated orders to the Department to comply with section 391, the Department did not do so. The status report it did file recommending maintenance of jurisdiction, merely stated that, with *no* accompanying facts or analysis. The Department filed no section 391 report describing whether it was in Nadia's best interests to remain under the court's dependency jurisdiction (§ 391, subd. (b)(2)), with "the facts supporting the conclusion

---

[5] The California Rules of Court allow the juvenile court to determine, if the nonminor was not provided with the section 391, subdivision (e) information, documents, and services, whether jurisdiction should be continued to ensure that all information, documents, and services are provided. (Cal. Rules of Court, rule 5.555(d)(1)(J).)

reached" (Cal. Rules of Court, rule 5.555(c)(1)(A)). Despite its representations that it wanted to set Nadia on the road to independence, the Department never indicated that it had provided Nadia with the information, documents, and services listed in section 391, subdivision (e). In short, the record contains no section 391 report.

It is unclear why the juvenile court allowed the Department to flout the court's valid orders. However, the failure of the Department to file its section 391 report deprived the court of the facts it needed to make the myriad findings required by both section 391 and California Rules of Court, rule 5.555 -- including the pivotal best interest determination -- and to exercise its discretion. Section 391 also precludes termination of jurisdiction here because the Department did not verify that it had given Nadia the information, documents, and services listed in subdivision (e), even if the reason for this omission was the Department's inclination to maintain the dependency and Nadia's pattern of intermittently vanishing and avoiding her social workers, and her persistent refusal to avail herself of the transition services the Department did make available. The juvenile court was held hostage to the Department's disobedience and Nadia's defiance. By failing to provide the court with the report section 391 mandates, which report the court had repeatedly ordered, the Department has blocked termination of this dependency. (§ 391, subd. (e); *In re Tamika C.*, *supra*, 131 Cal.App.4th at p. 1161.) Therefore, although the record supports the finding under section 391, subdivision (c)(1)(B) so as to justify terminating dependency jurisdiction over Nadia, the order was premature and must be reversed so that the Department can file the necessary reports and the court can make the required findings. (§ 391; Cal. Rules of Court, rule 5.555.)

14

DISPOSITION

The order terminating jurisdiction is reversed. The matter is remanded to the juvenile court with directions to order the Department to comply with section 391, and thereafter, the court shall conduct further proceedings consistent with the views expressed herein.

**CERTIFIED FOR PUBLICATION**

ALDRICH, J.

We concur:

KLEIN, P. J.

KITCHING, J.

15