[No. A098418. First Dist., Div. Three. Dec. 31, 2002.]

In re HOLLY H., a Person Coming Under the Juvenile Court Law.
CONTRA COSTA COUNTY SOCIAL SERVICES DEPARTMENT,
Plaintiff and Respondent, v.
HOLLY H., Defendant and Appellant.

1326

**COUNSEL**

Janet G. Sherwood, under appointment by the Court of Appeal, for Defendant and Appellant.

Silvano B. Marchesi, County Counsel, and Melinda Frey, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**POLLAK, J.**—This appeal questions the standard, in light of the enactment of Welfare and Institutions Code section 391,[1] for terminating the dependency of a minor who turns 18 years of age. In 1986, when Holly H. was three, the Contra Costa County Social Services Department (department) filed a dependency petition that brought her within the jurisdiction of the juvenile court. On March 1, 2002, when Holly was 19, the juvenile court vacated dependency and dismissed the dependency petition after finding that the department had met the requirements of section 391 by providing Holly with certain resources, and that Holly refused to take advantage of most offers of assistance. Through her attorney, Holly appeals, arguing that despite her often careless attitude toward the benefits she was offered, the court abused its discretion when it terminated jurisdiction because she is still in need of the court's assistance. We adhere to the decision in *In re Robert L.* (1998) 68 Cal.App.4th 789 [80 Cal.Rptr.2d 578] (*Robert L.*), that jurisdiction should be retained by the juvenile court beyond a dependent's 18th birthday only when there is an existing or reasonably foreseeable threat of harm to the child. While the best interest of the child remains the overriding standard, "[d]eciding what is best for a child often poses a question no less ultimate than the purposes and values of life itself." (Mnookin, In the Interest of Children: Advocacy, Law Reform, and Public Policy (1985) p. 18.) In light of the indeterminancy of this standard and the autonomy to which a person over 18 is entitled, once a young person has reached majority the juvenile court must give substantial deference to the youth's wishes before deciding to retain jurisdiction. We find that the trial court did not abuse its discretion in this case and affirm the order dismissing the dependency proceedings.

### BACKGROUND

Holly entered the dependency system at the age of three when the department filed a petition under section 300 alleging that she came within the jurisdiction of the juvenile court because of her mother's drug abuse and related neglect of Holly. Holly's father was no longer living at the time. The juvenile court assumed jurisdiction and placed Holly with her paternal grandparents. Eventually the court adopted a plan for the grandparents to become Holly's legal guardians, but for financial reasons the plan was changed to long-term foster care. In 1996, when Holly was 13, her grandmother became too ill to care for her and Holly was moved to a group home. Approximately two years later, Holly's grandmother passed away.

Over the years, Holly earned mostly poor grades in school. When she was 15, her social worker requested a psychological evaluation. The evaluation

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

revealed that Holly was severely behind her peers academically and that she had a serious learning disability. The evaluator also concluded that Holly had dysthymic disorder, a type of mood disorder. In October 1998, Holly was prescribed Prozac, which appeared to alleviate some of her symptoms of depression and hostility. However, Holly stopped taking the Prozac the next month.

In October 1999, a meeting was scheduled with Holly to design an individualized education plan. However, Holly reportedly "sabotaged her interviews by refusing to respond." She was referred to another program and by May 2000 she was in a nonpublic special education setting and performing well. She turned 18 in February 2001 and was placed in foster care because the group home planned to discharge her when she turned 18. In March 2001, she was diagnosed with lupus and kidney disease. In June 2001, she began receiving Social Security benefits because her father had died before she was 18 and she had moved out of her foster home. By January 2002 these payments had been discontinued.

A hearing was scheduled for January 10, 2002 to review Holly's dependency status. Prior to the hearing, the department filed a report and recommended that the petition be dismissed. The report noted that Holly had applied for Supplemental Security Income (SSI) benefits, but that the agency responsible for reviewing her application had reported that the application was "closed . . . possibly because she failed to appear for an evaluation . . . ." The report also observed that Holly was "reportedly currently living with the Spanish-speaking grandmother of a friend." Finally, the report stated that the department had secured for Holly her certified birth certificate, her Social Security card and a California identification card when she left her foster home.

Holly did not appear at the review hearing, but her social worker testified extensively about the difficulties the department was having in getting Holly to follow through with services that were offered to her. She testified that the department "had set her up several times with job training, and that she dropped out each time"; that Holly obtained a job at the Sacramento Children's Home, but lost it because she did not come to work; that "[s]he was in a school training program [and] [s]he again did not show up"; that she had refused medication and therapy for her depression and other psychiatric issues; and that she had missed many important doctor's appointments related to her kidney disease. The social worker also testified that the Sacramento Children's Home had taken Holly to get her California identification card.

The trial judge initially could not determine whether the department had met its burden of providing Holly with the documents and services required

by section 391 and continued the hearing, stating that he "would ask the department to make Holly H[.] available. I think we need her here in order to determine whether she's refusing services or whether she needs to continue services even though she is 18." When the department objected that it would be difficult or impossible to force Holly to appear, the court told Holly's attorney "I'm not going to put the burden on the department to have Ms. H[.] here. If you feel there's any question in your client's mind whether she wants continuing services or not, you can invite her to appear on the date we're going to set."

Prior to the continued hearing date, the department filed an addendum to its report and recommendation. The addendum noted that Holly graduated from high school on December 21, 2001. The social worker reported that Holly was living in Sacramento with her boyfriend; that she was receiving some assistance through the Sacramento County Independent Living Skills program which would be available to her until she turned 21; that the social worker from the Sacramento County program had offered to take Holly to get her identification card but that Holly refused the offer; and that the department had helped her apply for SSI benefits and had offered housing, educational and employment assistance. The social worker recommended that the court "[f]ind that the protection of [Holly's] interest no longer requires juvenile court supervision" and that it "[v]acate dependency and dismiss petition."

Holly did not appear at the continued hearing on March 1, 2002. Her attorney told the court that she "did not order her here since she is represented by competent Counsel, and I do represent her, and she does not have to appear, therefore." When the court expressed its concern that under section 391 Holly was required to appear unless she did not wish to do so, her counsel stated that Holly "was notified of the date." Holly's attorney argued that there was a "continuing risk of harm" to Holly since her social security benefits had been discontinued, she was not employed, and she had applied for SSI benefits but her application had not yet been processed. The court stated, "I appreciate your concerns, but what . . . should the department do that it has not done to meet 391? It appears to me, other than the I.D. card where your client has refused to go on two separate appointments, that the department has fulfilled the requirements of 391, and all I could do would be to continue the case until those requirements have been fulfilled. It doesn't address the harm to the individual, 391 doesn't, per se." The court went on to state that "she fails to meet the department halfway. I just don't see the department can do any more, and I am going to vacate and dismiss at this point in time."

Through her attorney, Holly appeals from the order dismissing the petition.[2]

## DISCUSSION

We must first decide what standard the trial court is to apply in deciding whether to terminate the jurisdiction of the juvenile court over a dependent child who has turned 18, and then determine whether the trial court abused its discretion when it dismissed the petition that brought Holly within its jurisdiction. (*Robert L., supra,* 68 Cal.App.4th at p. 793.) ■ The burden of persuasion is with the party seeking to terminate jurisdiction, in this case the department. (*Ibid.*)

■ While the juvenile court may not acquire jurisdiction over a person who is 18 years of age or older, once it has obtained jurisdiction of a minor it may retain jurisdiction until the dependent child turns 21. Under section 303, "[t]he court may retain jurisdiction over any person who is found to be a dependent child of the juvenile court until the ward or dependent child attains the age of 21 years." Conversely, under section 390, the dependency petition may be dismissed any time before the minor reaches age 21 "if the court finds that the interests of justice and the welfare of the minor require the dismissal, and that the parent or guardian of the minor is not in need of treatment or rehabilitation."

Jurisdiction is rarely retained through the age of 21, however, "in part due to the extensive efforts to either return the child to the custody of a parent or to implement a permanent plan of adoption or legal guardianship if reunification efforts fail." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2002) § 2.31, p. 2-55). Another reason jurisdiction is rarely retained past the age of 18 appears in the legislative history of section 391, which we discuss in detail below. "Although the juvenile court has the authority to retain jurisdiction over a dependent child until the age of 21, the reality is that federal funding for foster youth ends at the age of 18 and common practice is for the juvenile court to terminate jurisdiction at that time." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 686 (1999-2000 Reg. Sess.) as amended Aug. 29, 2000.)

■ In 2000, the Legislature added section 391 to the Welfare and Institutions Code. Section 391 was enacted in response to concerns that

---

[2]In denying the department's earlier motion to dismiss this appeal, this court rejected the department's contention that the appeal should be dismissed because there is no evidence that Holly authorized it. Although the department renews this contention, it cites to no new law, facts or circumstances and we therefore decline to reconsider the prior ruling.

dependent children who had reached the age of 18 were being removed from the dependency system before they had adequate skills or resources to support themselves, and evidence that 45 percent of these young persons became homeless within a year after leaving the foster care system. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 686 (1999-2000 Reg. Sess.) as amended Aug. 29, 2000.) The Youth Law Center, which sponsored the legislation, posited that "[h]omelessness is not merely a housing issue, but is related to poor education, lack of a support system, estrangement from family, lack of marketable skills, poor employment prospects and lack of community linkages. Emancipation of foster youth before they are ready to live independently creates significant costs— both to the youth and to the state." (*Ibid.*)

Section 391 provides that before terminating jurisdiction over a child who has reached majority, the county welfare department is required to: "(a) Ensure that the child is present in court, unless the child does not wish to appear in court, or document efforts by the county welfare department to locate the child when the child is not available [and] [¶] (b) Submit a report verifying that the following information, documents, and services have been provided to the child: [¶] (1) Written information concerning the child's dependency case, including his or her family history and placement history, the whereabouts of any siblings under the jurisdiction of the juvenile court, . . . directions on how to access the documents the child is entitled to inspect under Section 827, and the date on which the jurisdiction of the juvenile court would be terminated. [¶] (2) The following documents, where applicable: social security card, certified birth certificate, identification card, as described in Section 13000 of the Vehicle Code, death certificate of parent or parents, and proof of citizenship or residence. [¶] (3) Assistance in completing an application for Medi-Cal or assistance in obtaining other health insurance; referral to transitional housing, if available, or assistance in securing other housing; and assistance in obtaining employment or other financial support. [¶] (4) Assistance in applying for admission to college or to a vocational training program or other educational institution and in obtaining financial aid, where appropriate."

Under section 391, subdivision (c) the court has the discretion to "continue jurisdiction if it finds that the county welfare department has not met the requirements of subdivision (b) and that termination of jurisdiction would be harmful to the best interests of the child. If the court determines that continued jurisdiction is warranted pursuant to this section, the continuation shall only be ordered for that period of time necessary for the county welfare department to meet the requirements of subdivision (b)." Subdivision (c) specifies that the section "shall not be construed to limit the

discretion of the juvenile court to continue jurisdiction for other reasons." Finally, subdivision (c) also provides that "[t]he court may terminate jurisdiction if the county welfare department has offered the required services, and the child either has refused the services or, after reasonable efforts by the county welfare department, cannot be located." The legislative history reveals that this final language was added to clarify that section 391 "does not intend to prohibit the juvenile court from terminating jurisdiction if the child is absent or the county welfare department fails to provide the documents and services because the child has refused the services, or the child cannot be located after reasonable efforts by the county welfare department." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 686 (1999-2000 Reg. Sess.) as amended Apr. 20, 1999.)

*Robert L.* is the only reported decision to date addressing the propriety of terminating jurisdiction over a dependent child over 18 but under 21 years of age. Although decided prior to the enactment of section 391, the opinion articulates the standard to be applied in deciding whether to terminate the jurisdiction of the juvenile court after a dependent child turns 18. Robert was placed with his grandparents in long-term foster care so that his grandparents could continue to receive monthly foster care benefits that allowed them to care for him. Robert performed well in school and was accepted by the several universities to which he had applied. When Robert was about to turn 20, the social worker recommended that jurisdiction be terminated in light of Robert's success. Robert contested termination, arguing that continuing as a dependent would " 'help defray educational and living expenses.' " (*Robert L., supra,* 68 Cal.App.4th at p. 792.) Robert's grandfather told the social worker that termination of state financial aid would make it difficult for them to help Robert. The court retained jurisdiction through three more review hearings, receiving testimony from Robert at the last one that "if the grandparents did not receive foster care funding he would not be able to afford to graduate from college and society would benefit more if he paid higher taxes from increased earnings available to college graduates." The trial court found that continued jurisdiction was "necessary because conditions exist which justify jurisdiction under WIC 300 . . . ."

The Court of Appeal looked to section 300.2 for guidance in determining the governing standard. That section provides that the purpose of the laws relating to dependency "is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection and physical and emotional well-being of children who are at risk of that harm." The court reasoned that "[i]n determining whether to terminate jurisdiction over a child in long-term foster care, the issue to be addressed is the best

interest of the child," and concluded that the "exercise of jurisdiction must be based upon existing and reasonably foreseeable future harm to the welfare of the child. [Citation.] *Similar factors should come into play in determining whether jurisdiction should extend beyond the age of majority.*" (*Robert L., supra,* 68 Cal.App.4th at pp. 793-794, italics added.) The court determined that Robert did not face existing or reasonably foreseeable future harm within the meaning of section 300.2 simply because he might not be able to afford to complete his college education, and therefore directed that jurisdiction be terminated.

Section 391 does not change the standard set forth in *Robert L.,* that the "exercise of jurisdiction must be based upon existing and reasonably foreseeable future harm to the welfare of the child." (*Robert L., supra,* 68 Cal.App.4th at p. 794.) Section 391 contains a legislative directive that before jurisdiction of the juvenile court over a dependent child who has reached age 18 is terminated, certain minimal assistance and documentation be afforded the youth. However, whether or not those services have been provided, the decision to retain or terminate jurisdiction remains within the sound discretion of the juvenile court. Although subdivision (b) provides that the welfare department "*shall* . . . [¶] . . . [¶] [s]ubmit a report verifying that [the enumerated] information, documents, and services have been provided to the child" (italics added), subdivision (c) provides that "[t]he court *may* continue jurisdiction if it finds that the county welfare department has not met the requirements of subdivision (b) *and* that termination of jurisdiction would be harmful to the best interests of the child." (Italics added.) Thus, although subdivision (b) states that the department "shall" submit a report confirming that it has provided the dependent child with certain basic services, the decision to continue jurisdiction remains within the discretion of the court even if the department has not met its duties under that subdivision.[3] Conversely, even if all the services required by subdivision (b) have been provided, subdivision (c) makes explicit that "[t]his section shall not be construed to limit the discretion of the juvenile court to continue jurisdiction for other reasons."

Holly relies heavily on *In re Natasha H.* (1996) 46 Cal.App.4th 1151 [54 Cal.Rptr.2d 276] to support her argument that the standard for termination of the court's jurisdiction is the child's continuing need for services. In *In re Natasha H.* the court reviewed termination of dependency where the dependent, still a minor, had run away from every home in which she had been

---

[3]The seeming contradiction between the mandatory nature of section 391, subdivision (b) and the discretionary nature of the first sentence of subdivision (c) creates an interpretive conundrum. However, since we reject Holly's argument that the department failed to meet its obligations under subdivision (b), we need not address that riddle in this case.

placed. The department successfully argued to the juvenile court that continuing the jurisdiction of the dependency court would be "futile." (*Id.* at p. 1155.) The Court of Appeal reversed and held that "[o]bstinacy and defiance test the patience of adults charged with the tending to the needs of minor children. Under the trial court's reasoning the more obstinate the child the greater the justification for terminating jurisdiction. We disagree. As much as the minor might wish to be rid of court supervision, and as frustrating as her conduct might be to DHHS and the court, her misbehavior and lack of cooperation do not justify termination of her dependency status absent extraordinary circumstances not present here that make it in her best interest to do so." (*Id.* at p. 1153.)

*In re Natasha H.* implicitly highlights the importance of the dependent's status as minor or adult in the context of terminating the jurisdiction of the juvenile court.[4] ▮ While the state is entitled, and perhaps obligated, to override the desires of a juvenile if in the best interests of the child, that equation changes drastically when the youth reaches majority. The juvenile court was obligated to consider Natasha's continuing need for services, despite her own preferences, because she was still a minor. However, her preferences could not have been ignored if she were an adult. As another court observed, "the most significant difference between minors and adults is that '[t]he liberty interest of a minor is qualitatively different than that of an adult, being subject both to reasonable regulation by the state to an extent not permissible with adults [citations], and to an even greater extent to the control of the minor's parents unless "it appears that the parental decisions will jeopardize the health or safety of the child or have a potential for significant social burdens." [Citation.]' [Citation.] When the minor must be removed from the custody of his parents for his own welfare or for the safety and protection of the public (Welf. & Inst. Code, § 202), the state assuming the parents' role, the state also assumes the parents' authority to limit the minor's freedom of action." (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549].)

▮ The principle that minors and adults are treated differently is of course deeply embedded in our legal system.[5] "The State's interest in the welfare of its young citizens justifies a variety of protective measures.

---

[4] A person is considered a minor under the laws of California until he or she turns 18, and after that is considered to be an adult. (Fam. Code, §§ 6500, 6501.)

[5] The recognition that children need special protections and consequent preferential treatment of minors is not restricted to the United States. In 1959, the United Nations General Assembly adopted the Declaration of the Rights of the Child. This document acknowledges that "the child, by reason of his physical and mental immaturity, needs special safeguards and care, including appropriate legal protection . . ." and proclaims that "[t]he child shall enjoy special protection, and shall be given opportunities and facilities, by law and by other means,

Because he may not foresee the consequences of his decision, a minor may not make an enforceable bargain. He may not lawfully work or travel as he pleases, or even attend exhibitions of constitutionally protected adult motion pictures. . . . The State's interest in protecting a young person from harm justifies the imposition of restraints on his or her freedom even though comparable restraints on adults would be constitutionally impermissible." (*Planned Parenthood of Central Missouri v. Danforth* (1976) 428 U.S. 52, 102 [96 S.Ct. 2831, 2856, 49 L.Ed.2d 788].) These sentiments were echoed by our Supreme Court when it held that "[b]y no means are the rights of juveniles coextensive with those of adults. [Citation.] Minors' rights are often legitimately curtailed when the restriction serves a state's interest in promoting the health and growth of children." (*In re Scott K.* (1979) 24 Cal.3d 395, 401 [155 Cal.Rptr. 671, 595 P.2d 105].)

Minors cannot vote (Cal. Const., art. II, § 2; U.S. Const., 26th Amend.); marry except under certain limited circumstances (Fam. Code, § 301); serve on a jury or grand jury (Code Civ. Proc., § 197; Pen. Code, § 893); obtain a chauffeur's license or drive a school bus (Veh. Code, §§ 12515, 12516); purchase tobacco (Pen. Code, § 308, subd. (b); play bingo (presumably for money) (Pen. Code, § 326.5, subd. (e)); or execute a will (Prob. Code, § 6220). Cities and counties may enact curfews that apply only to minors (Welf. & Inst. Code, § 625.5). Generally, minors must have parental consent to engage in certain activities such as: receiving medical care (*American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 315 [66 Cal.Rptr.2d 210, 940 P.2d 797]); using a tanning salon (Bus. & Prof. Code, § 22706, subd. (b)(3) & (4)); undergoing voluntary sterilization (Fam. Code, § 6925, subd. (b)(1)); or getting a permanent tattoo (Pen. Code, § 653). Minors must have a guardian to appear in a civil action (Code Civ. Proc., § 372) and their claims in such actions can be settled on their behalf by their parents or guardians (Prob. Code, § 3500). The state may require that minors receive certain immunizations (Health & Saf. Code, § 120325 et seq.) and restrict their access to obscene materials (Pen. Code, §§ 313; 313.1; 313.2; *Ginsberg v. New York* (1968) 390 U.S. 629 [88 S.Ct. 1274, 20 L.Ed.2d 195]).

On the other hand, minors have the right to disaffirm most contracts (Fam. Code, § 6710) and are exempt from registering for military service. (50 U.S.C. Appen. § 453.) When minors commit what would otherwise be criminal offenses, their cases are heard separately from those of adults

---

to enable him to develop physically, mentally, morally, spiritually, and socially in a healthy and normal manner and in conditions of freedom and dignity. In the enactment of laws for this purpose the best interests of the child shall be the paramount consideration." Further, the document proclaims that "[t]he child who is physically, mentally, or socially handicapped shall be given the special treatment, education, and care required by his particular condition." (G.A. Res. 1386 U.N. GAOR, 14th Sess., Supp. No. 16, p. 19.)

(§ 602), proceedings are significantly less formal (§ 680), the records of proceedings are confidential (§ 827), and the objective of the proceedings includes a rehabilitative as well as a punitive component.[6]

While minors do not have the same freedoms as adults, and are specially protected by the law, these legal disabilities and privileges are removed when a person turns 18. Although maturity is not achieved overnight, when one reaches majority the law treats the young adult as a responsible person entitled to make independent decisions in conducting his or her affairs. Absent an adjudication that left to his or her own devices the person would be a threat to the safety of himself or herself or others (§ 5150), or conviction of a crime, adults are given the independence to make these decisions for themselves and to choose their own style of living to the extent their means permit. For this reason, when considering whether to continue to exert its jurisdiction over a dependent who has turned 18, the desires of the affected individual are entitled to considerably more weight than is called for when the individual is still a minor.[7] The court in *Robert L.* implicitly acknowledged this difference between those under 18 and those over 18 when it stated that "[s]*imilar* factors should come into play in determining whether jurisdiction should extend beyond the age of majority." (*Robert L., supra,* 68 Cal.App.4th at pp. 793-794, italics added.) In deciding whether to terminate jurisdiction over a youth who has reached majority, the court, after first determining whether the department has met its obligations under section 391, must consider whether termination would give rise to an existing or reasonably foreseeable future harm to the young adult. If not, *Robert L.* instructs that jurisdiction should be terminated. However, if there is a prospect of such harm, the court must decide whether retaining jurisdiction would ultimately serve the best interests of the child. But in evaluating the youth's *best interests,* and in balancing the multitude of factors that should influence the exercise of its discretion, the court must take into account that the person is no longer a minor and that his or her preferences are entitled to the increased respect due those of an adult.

---

[6]See *In re Gault* (1967) 387 U.S. 1, 15-16 [87 S.Ct. 1428, 1437-1438, 18 L.Ed.2d 527]. In 1984, following the adoption of Proposition 8 in the 1982 General Election (see Cal. Const., art. I, § 28, subd. (f)), the Legislature reenacted section 202 and placed increased emphasis on punishment of juveniles. However, even under the reenacted section, punishment of juveniles must be "consistent with the rehabilitative objectives of this chapter . . . ." (See, e.g., *In re Charles C.* (1991) 232 Cal.App.3d 952, 960 [284 Cal.Rptr. 4] ["In fact, the new language only reinforces the different purposes underlying the juvenile and adult procedures: [¶] . . . [¶] The state's punishment of minors is a 'rehabilitative tool' [citation], distinguishable from the criminal justice system for adults which has a purely punitive purpose separate from its rehabilitative goals"].)

[7]A minor who has achieved maturity may acquire the right to make some decisions before reaching majority (see, e.g., *Bellotti v. Baird* (1979) 443 U.S. 622, 643-644 [99 S.Ct. 3035, 3048-3049, 61 L.Ed.2d 797]), but absent incompetence or criminal behavior acquires that right no later than when becoming 18 years of age.

 Despite her attorney's arguments to the contrary, Holly has given every indication that she does not want the assistance of the juvenile dependency system. Through her attorney, Holly argues that the court abused its discretion by dismissing the petition since there was evidence that she "still needs the supervision, care and protection of the juvenile court." She points out that she has been separated from her siblings for years, and has moved from placement to placement with no hope for stability since her grandmother became too ill to care for her when she was 13. While she graduated from high school, it is undisputed that she has a serious learning disability. She has consistently failed to demonstrate that she is able to hold a job or even to complete job training. She has shown no ability to manage her finances, using the small amount of Social Security benefits that she was awarded as a result of her father's untimely death to move out of her group home. Her school counselor noted that she had "no savings, no plan for where to live or how to provide for herself [and] I am afraid that she will end up on the streets when she graduates . . . ."

Although one may reasonably conclude that these facts demonstrate a continued need for assistance, Holly has repeatedly refused to take advantage of services that have been offered to her. She failed to appear for an evaluation that might have allowed her to receive income from SSI[8]; she failed to report for a job that the department helped to secure for her; and as just noted she left her group home when she began receiving a very small, limited-term income as the result of her father's death.[9] Holly's continued participation in the juvenile dependency system cannot reasonably be expected to prevent any future harm when she has effectively rejected nearly all offers of assistance from the department. Moreover, Holly has not been charged with committing a crime, and there is no suggestion that she is subject to commitment under section 5150. Now that she has reached the age of majority and has acquired the rights and responsibilities that come with adulthood, the court may not, and should not, force her to accept its services. The trial court properly considered Holly's unwillingness to utilize the services that had been offered to her in deciding to terminate its jurisdiction.

[8]Holly argues that the department did not fulfill its obligations under section 391, subdivision (b)(3), which requires the department to verify that it has provided the child with "assistance in obtaining employment or other financial support." She argues that when jurisdiction was terminated she was unemployed and had no income at all and she discounts the social worker's report that she applied for SSI on Holly's behalf because the social worker had not done so at the earliest possible juncture, and because the county's fiscal agent did not keep track of the application after it was submitted to the Social Security Administration. However, the record indicates that Holly's application was denied because she failed to appear for her evaluation.

[9]Through her attorney, Holly argues that this lack of ability to follow through is due in part to the dysthymic disorder with which she was diagnosed. However, there is no evidence in the record to support—or to discredit—the argument that her inability to follow through on tasks and to keep appointments is due to the dysthymic disorder.

Further, termination of the court's jurisdiction will not leave Holly bereft of all services. Former foster care recipients are now entitled until they are 21 years old to additional services designed to help them make "the transition from adolescence to adulthood." (42 U.S.C. § 677(a)(5).)[10] The briefs indicate that Holly is receiving assistance from the Sacramento County Independent Living Skills Program and that these services are available to her until she turns 21. She has also been provided with the names of attorneys who can assist her in an appeal if her application for SSI is denied. No party, either below or on appeal, has identified a single specific service that Holly would be afforded and would utilize if she remained in the juvenile court system that she is not receiving through the independent living skills program.

Despite the many impediments to a secure and productive life that Holly still confronts, the state can no longer paternalistically insist that she live her life as the juvenile court thinks best. She confronts no imminent harm, she is an adult and presumably competent, she has not been charged with any criminal offense, and she has made her desires unmistakably clear. We may fear for Holly's future, but we cannot say that the court abused its discretion in terminating her dependency.

## DISPOSITION

The order dismissing the dependency proceedings is affirmed.

Corrigan, Acting P. J., and Parrilli, J., concurred.

---

[10]Under the Federal Foster Care Independence Act, federal funds are available "to provide financial, housing, counseling, employment, education, and other appropriate support and services to former foster care recipients between 18 and 21 years of age to complement their own efforts to achieve self-sufficiency and to assure that program participants recognize and accept their personal responsibility for preparing for and then making the transition from adolescence to adulthood; [as well as] [¶] . . . vouchers for education and training, including postsecondary training and education, to youths who have aged out of foster care." (42 U.S.C. § 677(a)(5) & (6).)