Filed 2/1/22  In re Estrella R. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re ESTRELLA R. et al., Persons Coming Under the Juvenile Court Law. | B309573 (Los Angeles County Super. Ct. No. 20CCJP02276A-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ENRIQUE R., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Craig S. Barnes, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane E. Kwon, Principal Deputy County Counsel, for Plaintiff and Respondent.

———————————

Enrique R. (father) appeals from the juvenile court's order terminating jurisdiction at the combined adjudication/disposition hearing. He contends that the juvenile court erred in terminating jurisdiction with a custody order (1) giving the parents joint legal custody of their four children, Estrella R. (Estrella, born May 2006), Enrique R. (Enrique, born Sept. 2007), Isiah R. (Isiah, born May 2010), and Carlos R. (Carlos, born Aug. 2013), and (2) granting Christina R. (mother) sole custody of the children.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Child Welfare History*

Between 2006 and 2009, there were multiple referrals to the Denver County and Jefferson County Child Protective Services (CPS) alleging domestic violence; some were deemed unfounded.

On May 31, 2009, Jefferson County CPS received a referral alleging that the parents had had an altercation that led to a car chase where father had the children in his car and he chased mother in another vehicle. He also exited the car at an intersection and chased mother on foot. Father was arrested for child endangerment and domestic violence. He was on probation at the time for a prior domestic violence charge, and this was his

third domestic violence charge involving mother.  Mother had moved out of their residence a few weeks prior and she had taken the steps to leave father.  The domestic violence allegations were deemed founded.

After the family moved to California, there were referrals to the Los Angeles Department of Children and Family Services (DCFS); they were deemed either unfounded or inconclusive.

*Detention Report (Apr. 28, 2020)*

On March 25, 2020, DCFS received a referral alleging father was physically violent towards mother in the children's presence.  DCFS received another referral the next day alleging domestic violence by father against mother in the children's presence.

DCFS Interview at Family Home

On April 3, 2020, a Children's Social Worker (CSW) interviewed mother and the children at the family home.  The home was clean, tidy, stocked with food, and no safety hazards were observed.

*Mother's report*

Mother reported that she met father at age 14 in Colorado.  They came to California 10 years ago to be closer to father's family, but mother also believed father wanted to "'isolate'" her from her family in Colorado.  Mother obtained a temporary domestic violence restraining order on March 30, 2020, to protect her and the children from father, but it was set to expire on July 8, 2020.  She had also filed for a restraining order in May 2019 after a domestic violence incident, but she moved to Colorado with the children and missed the court hearing.  Mother said that she returned to California in October 2019 because she received more financial aid here and the children missed their

3

father. In California, mother was going to file for divorce and custody of the children.

Per mother, father began harassing her at work by calling and showing up unannounced, and he found out where mother lived from one of the children. Father told mother that he had cancer so mother worried that the children would blame her for not allowing contacts with him if he died. Mother also thought father had changed because he went to therapy and treated her better. Mother allowed father to move back into the family home in January 2020 and they rekindled their relationship.

<u>March 25, 2020, Referral</u>

On March 24, 2020, mother said father insulted Estrella by saying the child was promiscuous like mother; mother and father argued, and father pushed mother, causing her to fall onto the floor, in Estrella's presence. Mother and father then entered a walk-in closet for privacy, where mother told father to leave and tried to break up with him, but he grabbed her by the arms and shook her. Thereafter, he apologized and begged her not to leave him. Mother said that she waited until the next day to call the police because she did not want to scare the children. According to mother, father previously manipulated the children by telling them "'look at what your mother is doing to me'" when she called the police, and he also threatened to kill himself in April 2019, in front of the children. So, mother made a police report on March 25, 2020, and met police officers at a nearby Target store. The corresponding police report corroborated mother's statements and further indicated that the children were present during the incident, mother was crying, mother stated that there had been 20 unreported and four reported prior incidents of domestic violence, and mother had tried to leave father in the past.

4

<u>March 26, 2020, Referral</u>

Another incident of domestic violence occurred the following day.  On March 26, 2020, mother tried to go to the laundromat with Estrella, but father blocked her, pushed the door closed, pushed her and caused her to fall face first into the front door.  Mother threatened to call the police so father sat on the couch with Estrella and put his arm over the child to block her from leaving.  Police arrived, father was arrested for domestic battery, and mother was issued an emergency protective order.  The corresponding police report corroborated mother's statements and further indicated the children were present during the incident, father had an outstanding Colorado warrant for a probation violation from prior domestic violence with mother, mother feared for her safety, she was crying, and she had tried to leave father before.  Father was arrested for intimate partner violence without injury and mother was given an emergency protective order for her and the children.

<u>March 30, 2020, Police Return to the Family Home</u>

On March 30, 2020, police again responded to the family home because father showed up at the mother's home after being released from jail.  Mother said she gave him his belongings and then quickly shut the door, but father continued banging on mother's front door.  She called police and he was arrested for violating the protective order.  Mother reported father was again released from jail on April 2, 2020.

Mother informed the CSW that there had been over 100 incidents of physical violence between father and mother during their 16-year relationship.  A lot of the violence happened in Colorado, where father was arrested multiple times for domestic

violence and child endangerment. Mother had also called police multiple times in 2019 while in California. Mother said Estrella and Enrique witnessed the most physical violence because father used to "'beat [her] up'" in front of them when they were two and three years old. The children also witnessed a lot of their arguments where father called her names.

Mother further reported that father was associated with a gang in Pacoima. She also said that father was hospitalized twice in Colorado for suicidal ideation, he had a history of marijuana use, used cocaine in October 2019, and he threatened to overdose on heroine in November 2019. Father also reportedly groped her breasts and buttocks in front of the children, told her she was "'his,'" and he tried to have sex with her when she did not want to. Mother said she witnessed father punch Enrique very hard on his lower back "'a few times,'" which mother did not like, but she never saw a mark or bruise. She last saw this in early 2019.

*Enrique's report*

Enrique told the CSW that his parents "'fight sometimes'" and called each other mean names. They usually argued, mother threatened to leave father, then father begged mother for forgiveness. He denied physical violence, but he "'want[ed] the fighting to stop'" and for mother and father to "'get along.'" He denied anyone hit him, but mother sometimes slapped him in the face when he was disrespectful. Enrique wanted to be able to see both of his parents; he worried where father was staying. He denied that father punched him in the back for discipline, but stated that they often play-fought. He said he was usually happy, but happier when father was home because they played games and had fun together.

*Isiah's report*

Isiah told the CSW that he saw mother and father argue all day long, about three times per week, and they called each other "'mean names.'" He saw mother hit father's hands but he never saw father hit mother. He did see father "'accidentally'" slap mother and father also "'accidentally'" pushed her into the front door when she tried to go do laundry. Isiah said the fights often happened where he was trying to sleep (either on the couch or bed in the living room). The child worried the fights would "'escalate'" and he believed it was bad for him and his siblings to see the fighting because it might impact how they perceived "'right and wrong,'" especially for Carlos who was the youngest. Isiah denied anyone hit him and he felt safe in mother's home, but mother slapped him in the face when he did not listen.

*Estrella's report*

Estrella told the CSW she saw father pull mother's hair. She also saw father push mother when she tried to go do laundry. Estrella said Enrique and Isiah probably denied seeing the parents fight because the boys were allied with father who often tried to get them to join him in his fights against mother. Father also reportedly said bad things about mother to all the children. Estrella said she "'used to be on that side'" when she was younger but now she saw that father was wrong. Estrella reported witnessing a lot of physical and verbal violence between father and mother. She saw father punch and push mother several times. She denied anyone hit her and she felt safe in mother's home, but mother smacked her in the face when she was disrespectful. Estrella said mother never left marks or bruises on her or her siblings. Estrella saw father punch Enrique in his

7

lower back last week when mother told father to discipline the child, but mother did not approve of father's actions.

*Carlos's report*

Carlos told the CSW he heard father and mother argue, mother yelled at father after he pulled her hair, and he saw father push mother last week. The child also remembered seeing mother and father fight when they lived at their old house about one and a half years ago. Carlos said he got spanked with a "'Japanese'" belt.

Prior CSW Report

A prior investigating social worker reported that the parents were living together at that time, but were in the process of separating. While there was no evidence of neglect, the social worker was concerned about ongoing domestic violence between father and mother, among other things.

April 6, 2020, Incident

On April 6, 2020, mother reported father was repeatedly calling her on her cell phone, so she filed a police report for violation of the restraining order.

Mother was afraid father would come back to the home if she left the children alone and she was afraid he would follow her if she left the home, even to drug test.

Interview with Maternal Aunt

A maternal aunt in Colorado told the CSW that mother and father had had domestic violence issues throughout their relationship. She witnessed father "'beat [mother] black and blue'" in July 2009, and mother told her that there had been several instances where father hit her since then. The aunt believed that all of the children witnessed father's violence. The aunt informed the CSW that mother wanted to go back to

8

Colorado to get away from father, and the aunt believed that mother would succeed this time because she had been more "'consistent'" about asking for help. The aunt also believed that mother had allowed father to move back in because he "'played the cancer card'" and said he was going to die. The aunt also saw father use cocaine years ago and said he was a heavy drinker. She believed that father had a "'psychological issue'" because he stalked mother and appeared to be obsessed with her. The aunt also worried that father manipulated the children against mother because he often told them intimate details about their relationship in order to get them to side with him. She had no safety concerns for the children and believed that mother was capable of caring for them.

<u>Interview with the Maternal Grandmother</u>

The maternal grandmother told the CSW that she spoke with mother regularly on the phone and was aware of the longstanding domestic violence in the relationship. The grandmother did not agree with mother moving back to California in 2019 and mother told her that she allowed father to move back in because mother thought father was going to die from cancer. The grandmother believed that mother wanted a two-parent household; thus, mother struggled to accept the relationship was over. According to the grandmother, mother recently called to let her know about the continued violence by father; mother planned to move to a hotel and then return to Colorado. The grandmother believed that mother would successfully leave father this time because mother recognized how father kept her from finishing school and getting a job in law enforcement. The grandmother also believed that father might have bipolar disorder "'or something'" because of his quick

shifting moods. In 2019, the maternal grandmother heard father call Estrella a "'whore'" during a monitored phone call, and he told the child that she had "'turned against [him].'" The grandmother said the children needed counseling due to the violence they witnessed and father's "'brainwashing.'"

### Mother Returned to Colorado

As of April 14, 2020, mother had moved to Colorado with the children. She told the CSW that she was doing things differently this time because she pursued the restraining order and called police each time father violated it. Mother said she moved to Colorado to get away from father and to be close to her family, not to flee from DCFS. She did not plan to return to California or continue a relationship with father.

### Interview with Father

Father called the CSW and said he was homeless and had no phone or mailing address, but he provided an e-mail address. Father acknowledged that there was a restraining order and that he had been arrested for violating it. Regarding the March 24, 2020, incident, father said that he asked Estrella if she wanted to "'be a little slut?'" in front of the other children and then he and mother argued. He denied pushing mother or calling her a "'whore.'"

On March 26, 2020, he did not want mother to take Estrella to the laundromat due to COVID-19, and as he moved from the bedroom to the living room, he "'accidentally'" pushed mother because he was a "'heavy dude'" and it was a small space.

On March 30, 2020, he went to the mother's home to get his belongings, which he thought was within the parameters of the emergency protective order. He denied any contact with mother

10

and the children since March 30. He also denied pulling mother's hair, claiming she made it up.

Father said that mother returned to Los Angeles in October 2019 to be with her boyfriend, Walter, and to go back to school. Per father, mother continued to contact him and he saw her driving under the influence of alcohol, without the children. Father said that mother had asked him to move back in in November 2019, but mother vacillated between him and Walter. Father moved in permanently in January 2020, but mother was not happy and wanted to move back to Colorado in February 2020. By March 2020, mother asked father to move out, but allowed him to stay until the COVID-19 crises resolved.

Father said mother had a habit of getting a restraining order when she wanted to take the children from father. He believed that mother was falsifying information so she could have a reason to make father move out and return to Colorado.

Father confirmed a history of domestic violence with mother. He said the 2008 and 2009 incidents occurred in Colorado because of mother's infidelity. He admitted that he pushed mother, punched her all over her body with his fists when he "'went crazy,'" and he chased her in his car. Father said mother pushed his head with her hands and called him a "loser'" and "'a piece of shit'" in front of the children. He denied punching Enrique and worried about the child because he appeared depressed, but mother minimized his concerns and said the child would be fine. Father admitted trying to kill himself in 2002 by hanging himself. He also admitted using multiple illicit substances in the past, but denied using cocaine or threatening to overdose on heroine. Father confirmed being diagnosed with

11

lung cancer in Fall 2019, but his treatments reportedly stopped because of COVID-19.

On April 17, 2020, DCFS obtained a court order to detain the children from father. Father was concerned that he was the only one being held accountable for the domestic violence. He alleged that mother left the children alone with the maternal grandmother, who abused alcohol and withheld meals for punishment. Father also alleged that mother did not monitor Estrella's phone use. He wanted to continue a relationship with the children, but not with mother.

Father's criminal history in California indicated arrests for Spousal Battery (3/26/20) and Contempt Violation of a Protective Order (3/30/20). In Colorado, father was arrested for Assault Third Degree Domestic Violence (8/2/08); Harassment Domestic Violence, Child Abuse, and Reckless Driving (5/29/09), and False Imprisonment Domestic Violence, Assault Third Degree Domestic Violence, and Menacing (7/19/09).

Additional Information

DCFS noted that mother demonstrated a willingness to separate from father by filing for a restraining order and consistently calling the police, the children appeared to have insight into the family's problems and used each other as support, and mother had support from maternal relatives. Mother was adamant that she did not plan to rekindle her relationship with father. While mother demonstrated protective capacity, DCFS noted mother's history of reneging on her plans to separate from father, which indicated an ongoing risk to the children. DCFS recommended that the children be detained from father and remain in mother's custody.

*Welfare & Institutions Code Section 300*[1] *Petition and Detention (Apr. 23 & 28, 2020)*

On April 23, 2020, DCFS filed a section 300 petition on behalf of the children, alleging that father and mother engaged in violent altercations in the children's presence and mother's failure to protect the children placed the children at risk of harm.

At the April 28, 2020, detention hearing, the juvenile court found a prima facie case that Estrella, Enrique, Isiah, and Carlos were children described by section 300 and detained them from father and released them to mother's custody. Father was given monitored visits with Enrique, Isiah, and Carlos, but he was ordered to have no contact with Estrella.

*Last Minute Information for the Court (July 2020)*

On July 9, 2020, the juvenile court was informed that mother had obtained a three-year criminal protective order restraining father from contact with mother and the children.

On or about July 21, 2020, the Colorado court declined to assert home state jurisdiction and consented to California exercising jurisdiction over the children.

*Jurisdiction and Disposition (Oct. 2020)*

In October 2020, DCFS reported that the children remained under mother's care, mother had returned to California in August 2020, mother found employment, the children attended school virtually, and there were no concerns. Mother was awaiting Medi-Cal reinstatement in order to obtain services for herself and the children. Father still had no stable housing, had not enrolled in services, and had not visited the children in

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

13

person, but had had FaceTime visits with them.  Father said he was aware of the criminal protective order and would not contact mother or Estrella.

Parties were reinterviewed telephonically in October 2020 about the petition allegations.

Interview with Estrella

Estrella confirmed father pulled mother's hair, pushed mother, and always tried to control mother.  Estrella said there were other times when she saw father punch and push mother.  The parents argued all the time.  Estrella also said father tried to manipulate the children, made them feel guilty to take his side, brainwashed Enrique and Isiah, and he talked "bad" about mother.  According to Estrella, it was a lot calmer now that father was not around.

Interview with Enrique

Enrique denied seeing any physical violence between father and mother, but confirmed they argued, called each other names, and constantly disrespected each other.  He just wanted the fighting to stop.

Interview with Isiah

Isiah reiterated the same statements he made to the CSW in prior interviews.  He also said that the parents argued so much he could not sleep, and he used to worry that the police would come and take father away.

Interview with Carlos

Carlos said father and mother argued, mother yelled at father and "'that's when he pulled her hair'" and pushed her.  Carlos said there were other times father pushed mother and they argued so often that he could not remember how many times.  Carlos stated, "'They get loud sometimes, it's scary.'"

14

Interview with Mother

Mother said she experienced father's emotional and physical abuse for most of their relationship and she was "'tired'" and had had enough. She did not expect father to change, but she had to change for her children because her kids had seen enough and she had to put their needs first. Mother confirmed that father pushed her to the floor, pulled her hair, grabbed her head, punched her, pushed her out the door, and called her several derogatory names, all in the children's presence. Mother said that father was emotionally abusive, very jealous, insecure, and he always blamed her when he was the one who always snapped and then would ask for forgiveness. Mother did not know why she stayed for so long and said, "'I guess I was scared to be alone.'" Mother again said father had gang ties and that she had been intimidated by statements that they could hurt her if she left father. According to mother, father was very controlling and had isolated her from her family. She came back to California in August 2020 because she could not find housing in Colorado, but soon realized it was no different in California. She had a full-time job in Colorado and she wanted to return there to be near her family and have their support. Mother had no plans to reconcile with father and planned on filing for divorce, but she wanted the children to maintain a relationship with him, within court rules.

Interview with Father

Father said, "'None of those incidents ever happened'" and he denied putting his hands on mother. Father said he grabbed mother by the arms but left no bruising. He admitted pushing mother while going through the door. Because he was a big guy, he stated "'so maybe [I] hurt her.'" Father said he last used drugs

15

10 years ago and was never diagnosed with a mental illness despite his suicide attempt in 2002. Father denied that there were multiple prior incidents of domestic violence during his and mother's 16-year relationship, said mother exaggerated, and he only acknowledged the incidents that were reported to the police. Father said the prior domestic violence was usually related to mother's infidelity. Father also said mother's family caused problems between them. Father denied gang affiliation but said his cousins were gang members.

Father reported that he was not criminally charged for the referral incident and he had no pending criminal proceedings. Father lived with different friends and was trying to stabilize his housing. He believed mother was setting him up so she could move on with another man, but father said his goal was to get help to work out his relationship with mother and be a family again.

Interview with the Maternal Aunt

The maternal aunt said she talked to mother almost every day. The aunt last saw a domestic violence incident in July 2019 when father "'left [mother] pretty marked up.'" Since then, mother had told her about several other incidents where father "'put hands on her.'" The aunt was almost certain the children witnessed the fights and father guilted the children and made them choose sides. According to the aunt, father was obsessed with mother and mother needed to return to Colorado where she had more support. The aunt said mother was "'serious this time about leaving [father]'" because she got a restraining order and seemed more focused about moving on and providing a stable home for the children.

16

DCFS Recommendation

DCFS noted a pattern of domestic violence that started in 2008, and DCFS remained concerned that mother had a history of reneging on her plans to separate from father, but DCFS recommended the children remain in mother's care.

*Last Minute Information for the Court (Nov. 16, 2020)*

DCFS confirmed that mother and the children had moved back to Colorado on November 2, 2020. A CSW traveled to Colorado to verify the mother's residence and check on the children's welfare.

Mother's Statements

Mother reported the transition to Colorado was smooth, she was gainfully employed, and Estrella watched the children while mother was at work. Mother said this move was going to be permanent and she had no intention of returning to Los Angeles.

According to mother, father had not communicated with the children and she communicated with him via text messages. He accused her of moving to Colorado to be with another man, accused her of drinking alcohol, and claimed that she left the children with other men. Mother said that she asked father to stop texting her and denied his allegations. The CSW told mother to stop responding to his texts and to contact law enforcement because father was violating the restraining order. The CSW observed that mother appeared to lack knowledge and awareness about domestic violence, including the different types of abuse, power and control issues, and the cycle of abuse. After discussing these issues with the CSW, mother said she was coming to terms with the fact that father was not willing to change. Mother again stated she had no intention of being in a

17

relationship with father, but she struggled with the guilt of having the children grow up without a father.

Mother understood father's behaviors negatively impacted the children so she wanted to coparent with him in a healthy manner. She planned to keep herself and the children away from father until he decided to address his issues. Her maternal family would create a strong support system for the children with good influences. Mother planned to resume therapy for the children with the same Colorado agency the children utilized in the past, and she would also resume individual counseling and domestic violence support groups for herself.

The Children's Statements

All four children indicated that the move and transition to Colorado was "good" and/or "'okay.'" The children had not seen father since they moved, and Enrique said that he missed him. The children felt safe with mother.

CSW's Report

The CSW did not see father or any of his belongings in the home and mother's lease agreement did not include father. The CSW verified that the children were enrolled in school. She advised mother to get the children into therapy as soon as possible.

Interview with the Maternal Aunt

The maternal aunt reported that she and the maternal family were very supportive of mother and the children in Colorado. The aunt said that she would call the police herself if she found out that father violated the restraining order. The aunt did not believe father would travel to Colorado because he had active Colorado warrants with probable jail time.

Additional Information and DCFS Recommendations

DCFS had not known that in August 2020, while mother and children were in California, mother had allowed father to move in with them. Mother later admitted violating the restraining order and said the children had really wanted to see father. Mother said there were no domestic violence incidents while father was in the home. DCFS was concerned about mother's continued lack of insight regarding the cycle of violence. DCFS contacted Colorado's Jefferson County CPS and requested supervision while the family remained in Colorado. Jefferson County CPS declined the referral because they believed there was no immediate child safety concerns and/or recent incidents.[2]

Ultimately, DCFS recommended sustaining the petition as pled and terminating juvenile court jurisdiction because mother and the children no longer resided in California. DCFS also recommended joint legal custody of the children to both parents, sole physical custody to mother, and monitored visits for father.

*Jurisdiction and Disposition Hearing (Nov. 18, 2020)*

After DCFS reports were admitted into evidence, DCFS's and the children's counsel argued to sustain the petition in its entirety.

Mother's counsel argued to remove mother as a failure to protect. Counsel indicated that mother was a victim in a volatile and dangerous situation for herself and the children, but she had obtained a criminal protective order, was cooperative, changed her phone number, and moved back to Colorado where she had a significant support system. Counsel added that mother had

---

[2] DCFS had unsuccessfully attempted to transfer the case to Jefferson County CPS in July 2000.

19

finally obtained the tools and strength to stabilize herself and the family in a different state. Counsel also noted that DCFS allowed mother to move to Colorado, visited the family there, and recommended terminating jurisdiction, all of which indicated that DCFS was not worried about the children in mother's care or her protective capacities.

Father's counsel argued to dismiss the petition in full because father had been forthcoming throughout the case, which counsel did not believe was consistent with a domestic violence abuser. Counsel stated, "At worst, in terms of father, he's in a situation of mutual combat with the mother, who doesn't keep going back because he's an abuser; she keeps coming back because they're equally situated." Alternatively, counsel requested the petition be amended to reflect mutual physical altercations.

After reviewing the evidence and hearing argument, the juvenile court sustained the domestic violence counts under section 300, subdivisions (a) and (b), but amended mother's failure to protect language by interlineation to indicate mother's "'inability'" to protect the children. In so ruling, the juvenile court stated: "In terms of mother's failure to protect, I think it's more inability to protect. She has come back into these situations, and she's made clear that the children are in the zone of danger, that they're percipient witnesses.

"And given the extent of the violence that's been described, I can't say that they're not at risk of serious physical harm, and this gets acted out. And in addition to that, the ongoing risk for father to come back into the home raises questions about the effectiveness of any order of the court if it's not going to be complied with by both of the parents. [¶] . . . What I see is

20

mother is largely the victim here, and has in many respects acted as one who has had a long history of being abused. [¶] . . . She waxes and wanes between protective and not, and it's early on in the process for her."

The juvenile court immediately proceeded to disposition and father's counsel stated, "I do think my client would certainly prefer the case stay open, especially given all of the visitation issues that have been occurring, as the minors have been in Colorado this entire time, and he's not been able to see his children or have contact with them."

The children's counsel joined DCFS and argued to terminate jurisdiction because the children were living in Colorado, enrolled in school there, and the move appeared permanent.

After reviewing the evidence and considering argument, the juvenile court declared the children dependents of the court, and then terminated jurisdiction pending receipt of the Juvenile Custody Order (JCO), which granted the parents joint legal custody and mother sole physical custody of the children. The juvenile court confirmed with counsel that the parents were going to attend mediation to work out father's visitation and case plan. If the parties could not resolve those issues, they were ordered to return in December.

*Juvenile Custody Order Hearing (Dec. 8, 2020)*

Mediation was unsuccessful, so the parties returned to court on December 8, 2020. Regarding father's case plan, father's counsel requested individual counseling for case issues, including domestic violence, a parenting class, and unmonitored visits with overnights. Counsel also requested that mother give father notice of any change in her residence and that father be allowed

21

six-hour weekly in-person visits and three weekly telephonic visits for one hour with all of the children present, except Estrella until the criminal protective order was modified.

Mother's counsel indicated that mother was opposed to any unmonitored contacts until father engaged in a court-ordered case plan. Counsel argued that father's interactions with the children were not in their best interests until father came to terms with what domestic violence meant, how to steer away from it, and how to get out of that pattern. Counsel also disagreed with mother having to provide father notice of her residence changes.

After hearing argument, the juvenile court clarified that the mediation was for the parents to work out visitation because the court previously decided on joint legal custody for both parents and sole physical custody to mother. It stated that the JCO would also include father's case plan that he participate in individual counseling, parenting, a 26-week domestic violence program, and upon completion of his case plan, father could go into court to seek a modification of the custody order. It added: "The order's going to be that he have monitored visits . . . [¶] . . . six-hour minimum per week for in-person . . . . If not, father to have monitored phone contact with the three children. Father to continue to comply with the [criminal protective order] with respect to Estrella."

Lastly, father's counsel asked if father could visit Estrella if the criminal protective order was modified. The juvenile court replied that once the juvenile court terminated jurisdiction, the criminal protective order would still remain in place and the criminal court would address any modifications to the order,

22

including visitation, so father would be able to seek a modification in the criminal court directly.

The same day, the juvenile court signed the finalized JCO, which indicated the parents shared joint legal custody of the children, mother had sole physical custody, and father had monitored visits with the children because he had not made substantial progress in a domestic violence treatment program for offenders, parenting classes, or individual counseling to address case issues.

*Notice of Appeal*

Father's timely appeal ensued.

## DISCUSSION

### I. *Order Terminating Jurisdiction*

Father does not challenge the juvenile court's jurisdictional findings. Instead, he assails the juvenile court's order terminating dependency jurisdiction. According to father, the children were at a current and ongoing risk of harm, demonstrating that continued supervision was necessary.

A. <u>Relevant law</u>

We review the order terminating jurisdiction either for an abuse of discretion (*In re Holly H.* (2002) 104 Cal.App.4th 1324, 1327 [abuse of discretion]) or for substantial evidence (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1156 (*Aurora P.*)).

Where, as here, the juvenile court has not removed a child from the parent having physical custody over the child (who in this case was mother), section 364 provides that the court "shall terminate its jurisdiction" unless DCFS or a parent "establishes . . . that the conditions still exist which would justify initial assumption of [dependency] jurisdiction" or are "likely to exist if [juvenile court] supervision is withdrawn." (§ 364, subds. (a) &

23

(c); *In re T.S.* (2020) 52 Cal.App.5th 503, 512–513; *In re J.F.* (2014) 228 Cal.App.4th 202, 209 [any "conditions" that "would" justify jurisdiction suffice].) By specifying that the court "shall" terminate jurisdiction "'unless'" "'conditions still exist,'" section 364 erects a "'statutory presumption'" in favor of termination. (*Aurora P.*, *supra*, 241 Cal.App.4th at p. 1155.)

    B. <u>Analysis</u>

    Applying these legal principles, we conclude that the juvenile court did not err in terminating jurisdiction with a juvenile court custody order. Court supervision was no longer necessary. Mother had obtained a three-year criminal protective order; mother had moved to Colorado with no intention of returning to California; mother had no desire to resume her relationship with father; maternal relatives in Colorado were involved and would call the police if father violated the protective order; and father had active warrants in Colorado that would deter his travel to that state. Even the local agency, Jefferson County CPS, determined that there were no immediate child safety concerns or any recent domestic violence incidents that necessitated CPS intervention. The evidence also indicated that father had abided by the protective order and stayed away from mother and the children. And, the JCO contained protective provisions, such as monitored visitation for father, a court-ordered case plan including a 26-week domestic violence class for offenders, parenting classes, and individual counseling to address case issues. (*In re Destiny D.* (2017) 15 Cal.App.5th 197, 208 [juvenile court has authority to impose limitations on an offending parent's contact with a dependent child before terminating jurisdiction]; *In re Chantal S.* (1996) 13 Cal.4th 196, 204 ["[t]he juvenile court's determination, that continuation of

24

dependency jurisdiction was at that time unnecessary for [minor's] protection, was in turn [properly] premised on the existence of the court's custody and visitation order"].)

Under these circumstances, the juvenile court's order terminating jurisdiction was proper.

II. *Order for Monitored Visitation*

Father argues that the juvenile court erred when it restricted father to monitored visitation in the custody order.

A. Standard of review

The juvenile court is afforded wide discretion in determining the appropriate terms and conditions of visitation between dependent children and their parents. (*In re Megan B.* (1991) 235 Cal.App.3d 942, 953.) Therefore, we review the juvenile court's visitation order for abuse of discretion. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 48–51.) We will not reverse the visitation order """unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].""" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) """When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.""" (*Id.* at p. 319.)

B. Applicable law

Section 362.4, subdivision (a), provides, in relevant part: "If the juvenile court terminates its jurisdiction over a minor . . . and . . . an order has been entered with regard to the custody of that minor, the juvenile court on its own motion, may issue . . . an order determining . . . visitation with . . . the child." (§ 362.4, subd. (a).)

25

"Visitation is a necessary and integral component of any reunification plan.  [Citations.]" (*In re S.H.* (2003) 111 Cal.App.4th 310, 317.)  It is well-settled that visitation rights arise from the very "fact of parenthood" and the constitutionally protected right "'to marry, establish a home and bring up children.'" (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 756–757.)  However, a parent's liberty interest in the care, custody and companionship of children cannot be maintained at the expense of the children's well-being.  (§ 362.1, subd. (a)(1)(B); *In re Joseph B.* (1996) 42 Cal.App.4th 890, 900; *In re T.M.* (2016) 4 Cal.App.5th 1214, 1220.)

While visitation is a key element of reunification, the juvenile court must focus on the best interests of the children "and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, the harm specified in section 300." (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1376.)  This includes harm suffered, or risk of harm, as a result of domestic violence between parents. (See, e.g., *In re Heather A.* (1996) 52 Cal.App.4th 183, 194–195.)

C. <u>Analysis</u>

Applying these legal principles, we conclude that the juvenile court acted well within its discretion in ordering that father's visits with the children remain monitored.  The children had witnessed the long-standing domestic violence between father and mother, which, at times, required law enforcement interventions; mother and Estrella witnessed father punch Enrique in his lower back, a few times; and mother, Estrella, and the maternal relatives reported that father manipulated the children, talked badly about mother to them, told them intimate details about mother and father's relationship, and guilted the

children into siding with him in his fights against mother. The maternal grandmother said that the children needed therapy due to the violence they had witnessed and father's "'brainwashing.'" Moreover, father continued to minimize and deny engaging in domestic violence against mother and as of November 16, 2020, mother said that father continued to make false accusations against her.

In light of the underlying case issues that brought the children under the juvenile court's jurisdiction, coupled with father's continued lack of insight and accountability, the juvenile court's order for monitored visits was proper.

## DISPOSITION

The juvenile court's order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ